11WICKER, Judge.
This appeal arises from a suit filed on behalf of Vanessa A. Johnson (Vanessa) and Welton A. Johnson (Welton), plaintiffs/appel-lees, against John Jay Reynolds (Reynolds), Ingram Industries, Inc. (Ingram), and Reliance Insurance Company (Reliance), defendants/appellants. Plaintiffs seek damages as a result of a vehicular collision in proceeding number 97-CA-1179.[1] The trial judge ren *983 dered judgment in favor of the plaintiffs/ap-pellees in the amount of $102,703.02.[2] The trial judge found Reynolds to be 100% at fault for the accident. Reynolds, Ingram, and Reliance now appeal. We affirm.
On appeal the appellants specify as errors the fault assessment and quantum.
MANIFEST ERROR: COMPARATIVE FAULT
Appellants argue the trial court’s finding that Reynolds was 100% at fault was clearly wrong since Vanessa was the driver of an overtaking or passing vehicle who did not wait to ascertain whether it was safe to pass Reynolds. The appellants also argue that Vanessa violated La.R.S. 32:76 by passing Reynolds within 100 feet of an intersection.
The trial judge made a credibility determination in according Vanessa’s testimony greater weight. We do not find he was manifestly erroneous in determining the accident occurred as described by Vanessa. The trial judge gave the following reasons for judgment:
This two-car accident ... occurred on February 11, 1994, on Louisiana Highway 18 (River Road) ... This accident occurred hafter the defendant initiated a right turn . onto Johnson Street which he at once recognized to be too narrow to accommodate his company truck. He immediately corrected this mistake by turning left, in a U-turn manner, onto River Road into the path of plaintiffs following car. The plaintiff crossed the River Road’s centerline and passed to the left of Defendant’s truck believing he would turn right onto Johnson Street. The Defendant’s actions caused this collision. The evidence was in conflict regarding whether the defendant made an abrupt left, U-turn, on River Road after initially intending to turn right, per the plaintiffs testimony. Or, whether he attempted to simply turn left off River Road onto a partial grass-gravel area on the river levee, per Defendant’s testimony. I credit the testimony of the plaintiff, Vanessa Johnson, and accordingly find that the defendant signaled a right turn prior to trying to turn right onto Johnson Street. When he determined he could not maneuver his truck onto this narrow side street, he instantly turned left, in a U-turn manner, back, onto the River Road without cheeking for following traffic. The confusion created by his unfamiliarity with the area and mistaken right turn averted his attention from following traffic. I do not credit the Defendant’s testimony where he denies using his right turn signal. The defendant acknowledged that he was lost, unfamiliar with the area and searching for his company’s business operation on the Mississippi River. He further admitted, under cross-examination, that he “moved,” his truck to the right side of River Road, near Johnson Street, prior to turning left. This Court concludes that the confusion created by the Defendant’s lost direction, failed right turn attempt onto Johnson Street, then abrupt left U-turn maneuver back onto River Road forestalled his checking for following traffic and caused this collision. An eyewitness, Tonya Co-ger, corroborates plaintiffs version of this accident, even though her prior statement to the investigating State Trooper indicated an uncertainty as to which turn signal the Defendant used ... This Court finds that the defendant acted unreasonably and violated the duties established in La. R.S. 32:104. This Court additionally finds the defendant, Jon Reynolds, 100 percent at fault and agrees with the reasoning and the conclusions of the Court in Thomas v. Champion Insurance Company [603 So.2d 766 (La.App. 3rd Cir.1992) ], a similar factual case. This Court assigns no comparative negligence to the plaintiff finding no violation of La. R.S.32:76. Steven Strength, DOTD Engineer, testified that the area where the accident occurred was not marked for a “no passing zone.”[Emphasis in original; footnotes omitted.]
Appellants argue that even though the trial judge found that Reynolds activated the *984 wrong turn signal, that finding does not mean Reynolds was 100% at fault. They argue that at the least it is the combined fault of both drivers which caused the accident. We agree with appellants that Vanessa, as an overtaking motorist also had a duty to determine she could safely pass Reynolds. The trial judge concluded that at the time Vanessa attempted to pass Reynolds the indication through his actions was that she could do so safely. We are not persuaded by appellants’ argument that Vanessa’g failure to show she had a need to pass Reynolds shows a | sbreach of duty or negligence on her part. We are also not persuaded by appellants’ argument that Vanessa had to wait until Reynolds had fully executed a right turn prior to passing him.
Appellants also contend that the photographs of the Reynolds’ truck,' a truck with an extended cab, show that the size of the truck precluded a sharp change in direction. The trial judge reviewed the photographs and the conflicting testimony. We find no manifest error in his placing little weight on Reynolds’ testimony that such a maneuver was impossible. Appellants would also have the court rely on the conclusion of law stated by Officer Staty Lewis, the State Trooper who investigated the accident. Appellants state that Lewis concluded Vanessa caused the accident. However, the trial judge made a credibility determination and concluded otherwise. •
Additionally, appellants argue that the trial judge erred in failing to find a violation of La.R.S. 32:76 and in relying on the Thomas, infra case. Appellants contend the Thomas case did not involve an overtaking motorist as in the case at bar. In Thomas there was a factual dispute as to whether the accident occurred when an overtaking motorist passed a left turning vehicle or whether the accident occurred when a vehicle veered from the shoulder onto the highway. The trial judge in that case concluded that the accident was caused by the failure of the left turning vehicle to give a proper left turn signal and in failing to see the overtaking vehicle. In Thomas the court discussed the duty imposed by La.R.S. 32:104.[3]
The Thomas court explained at 767 (citing Attales v. Shelter Mutual Ins. Co., 488 So.2d 474, 476 (La.App. 3d Cir.1986)):
... it is well settled law, and we have previously stated that:
A left turn is generally a dangerous maneuver which must not be undertaken until the turning motorist ascertains that the turn can be made in safety. A left-turning motorist involved in an accident is burdened with a presumption of liability and the motorist must show that .he is free of negligence [citations omitted.]
We find the trial judge correctly relied on the proper analysis set forth in Thomas.
Additionally, appellants argue that Vanessa violated La.R.S. 32:76(A)(2)[4] when she attempted to pass Reynolds, within 100 feet of the junction. In Henry v. Highlands Ins. Co., 315 So.2d 145 (La.App. 3rd Cir. *985 1975) the court set forth the test for determining whether a junction fell within the intended scope of the statute. In that case the court found that the junction did not fall within the meaning of an intersection so as to constitute a violation of the statute when the overtaking motorist passed another motorist within 100 feet of an alleged intersection. The court explained at 147:
It is fundamental that for La.R.S. 32:76 to be applicable the junction at which Ki-bodeaux was turning must be an intersection within the intended scope of that statute. Every highway junction does not fall within that scope. See, e.g., Chapman v. Harrison Pipeline Company, 261 So.2d 82 (La.App. 3rd Cir.1972). Whether a junction is an intersection under the statute rests upon the particular facts of the case. Chapman v. Harrison Pipeline Company, supra. In making the determination of whether a junction is an intersection under R.S. 32:76 the following factors are considered: (1) whether the intersecting thoroughfares are public or private, (2) their comparative widths, (3) the type of construction (paved, gravel, dirt, etc.), (4) the presence or absence of any sign or markings, and (5) the amount of use of each. Guillory v. Travelers Insurance Company, 241 So.2d 772 (La.App. 3rd Cir.1970).
In the instant ease the trial judge did not err in concluding that Johnson Street did not fall within the scope of the statute. The trial judge specifically determined from the un-controverted evidence that Johnson Street was a narrow street and that La. 18 was not marked as a no passing zone at that location.
JsMANIFEST ERROR/ABUSE OF DISCRETION: QUANTUM
Appellants argue the damage awards should be reversed or amended. They note that special medical damages were stipulated to be $10,666.02, leaving $81,537 in general damages. They contend the general damage award was manifestly erroneous with regard to any award to Vanessa for damages related to her pregnancy. Further, appellants argue the damage award was excessive with regard to her right leg injury and constitutes an abuse of discretion.
Appellants note the trial judge awarded general damages based on a hematoma of the right thigh, with its related problems, and the premature birth of a seven-month term fetus.[5] The trial judge reasoned that the birth required a two-day hospital stay. Appellants correctly state that Vanessa had been previously scheduled for a cesarian section for February 17, 1994, which was six days after the accident. Vanessa testified her obstetrician last saw her a few days before the accident when he scheduled the cesarian at that time.
Vanessa stated that following the accident she was transported by ambulance to Tulane Medical Center. At that time she was fearful regarding her pregnancy. The emergency room personnel contacted her obstetrician, Dr. Stephen Fortunato. Dr. Fortunato requested that she remain in the hospital overnight because of his concern about the pregnancy. After leaving the emergency room she was placed in the labor and delivery room until the 13th. She went into labor within 24 hours of the accident.[6]
She was treated with medication to stop the contractions and was held in the hospital for observation. The medication stopped the contractions and she left the hospital around 7:00 p.m. on the 13th. Her physician then placed her on bed rest in order to prevent her from going into labor. She delivered the child on the 17th as scheduled.
The trial judge stated the accident “precipitated a premature delivery ... requiring *986 16two-day hospital stay.” While the accident itself did not result in a premature birth, it nonetheless precipitated the potential for premature delivery since Vanessa began having contractions after the accident. Furthermore, Vanessa was successfully treated with medication and bed rest so that she avoided the result of a premature delivery. The trial judge was evidently mindful of the need for treatment as a result of the accident to prevent a premature delivery. Although the trial judge used the term, “delivery” it is clear from the record that he was referring to the premature “labor.” We find no abuse of discretion for awarding damages to Vanessa for premature labor.
In considering the amount of general damages, we note that in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993) the Louisiana Supreme Court explained that the trier of fact is vested with vast discretion and noted:
It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
The trial judge did not apportion the award of damages. Considering all of the injuries in light of Youn, we find no abuse of the trial judge’s discretion under these particular circumstances in awarding total general damages in the amount of $81,537,
The medical records reflect that on the date of the accident, Vanessa complained of multiple injuries. She complained of right leg pain, right hip pain, and an abrasion to the right side of her forehead. The records also reflect that she complained of pain over her entire body during her hospital stay.
Vanessa testified that after the accident’, she was bleeding from her forehead where her forehead had struck the windshield. To-nyanekie Coger (Coger), a witness to the accident, also testified to the bleeding. In addition, Coger voiced shock at noticing Vanessa’s hair was “coming out.”
Vanessa testified her leg was jammed against the stick shift. She had a headache, and severe pain in her leg, as well as other cuts and bruises. She felt pain all over her body. After she was released from the hospital from her two-day stay following the accident, she was required to remain on bed rest until the 17th. After the delivery of the baby on the 17th, she Rbegan seeing Dr. James Butler for treatment of her leg injury.
She described her pain in the leg as intermittent. She also noted swelling, itching, and burning in the area, which was above her right knee. However, she was able to walk without assistance. She initially took anti-inflammatory medication prescribed by Dr. Butler. She subsequently used over the counter medication. Vanessa explained that she now took over the counter medication rather than prescribed medication because she was concerned about the effect of prescribed medication on pregnancy. She takes over the counter pain medication approximately once or twice a week. These help alleviate the pain.
Vanessa testified that she had surgery on her leg in May 1994. She was given general anesthesia for the surgery and was hospitalized overnight. After the surgery she wore a brace on her leg. She did not require a crutch or a cane in order to walk. She returned to work in June 1995. Within a month following the surgery her symptoms returned. Dr. Butler discussed the option of further surgery. She had a second surgery in September 1994.
For the second surgery she again had general anesthesia and stayed overnight in the hospital. After the second surgery she saw Dr. Butler two weeks later. She stated that her symptoms had not improved. Dr. Butler again suggested another surgery, but could not guarantee the surgery would alleviate her symptoms. He told her she would have to live with the pain. Vanessa returned to work immediately following the second surgery. However, she stated that she walked with a limp. She also has a scar from the surgery.
Vanessa stated her next visit with Dr. Butler was in January 1995. She continued to have intermittent pain. The following visit was several months later. The symptoms *987 began to change m 1995. She began to limp and to have more frequent pain.
She last saw Dr. Butler July 2,1997, a few days before trial. She returned to him because the pain and limping increased. Dr. Butler gave her three options. He suggested she live with the pain, have' surgery, or be referred to a pain specialist. She decided to live with the pain and to accept a referral to a pain specialist.
She described the pain as a “lightening bolt” which is unbearable at times.
Prior to the accident she was in good health and enjoyed activities with her husband. Now she can no longer engage in fishing activities with her husband because she has to stop and rest. Before the accident she fished with her husband once or twice a month. Since the [gaccident she has only engaged in that activity one time.
Prior to the accident she walked with her husband during the warm months three to four times a week. Since the accident she no longer walks with her husband.
She does attend her son’s football games but leaves two hours early because of the walking required to get to the stadium. She further testified she no longer stays up late at night to watch movies because she is in pain after a day at work. She goes to bed because of the pain. Prior to the accident she watched movies once or twice a week. After the accident she watches them once a month.
Welton testified that as of the date of trial Vanessa reported unbearable pain approximately three times a week. On those days, she takes pain medication and goes to bed early. As a result, their movie watching has become limited to once a month instead of two or three times a week. He and his wife no longer bowl once a month as they once did. They have only fished one time since the accident. He never asks her to walk as they once did. The incidence of sexual relations has decreased dramatically from two to three times a week to once every six weeks.
Dr. Butler, an expert in orthopedic surgery, testified as follows. He first saw Vanessa on March 4, 1994. She complained of knee pain, burning in the area, swelling, and occasional weakness in her leg. On that date she had a large fluid-filled area on the outer aspect of her lower thigh • above the level of the knee joint. She complained of tenderness in the area. She had a normal range of motion. The x-rays did not show any fracture or bony damage to the knee. He felt she probably had a hematoma or accumulation of blood or fluid beneath the skin, caused by the accident. The hematoma was approximately six inches by four inches.
Dr. Butler suggested aspirating the area with a needle. She declined and he asked her to return in three weeks. He next saw her March 25, 1994. She was improved but still complained of a burning sensation in the area. The hematoma was becoming firm. She still did not want it aspirated. He advised her to return in three weeks. They also discussed the possibility of surgical removal of the fluid cavity. She decided to have surgery.
■He performed surgery on May 5, 1994. He made an incision on the lower thigh above the knee, approximately five inches long. He removed a cavity filled with fluid and a | ggelatinous material. The cavity was between the muscle layer and the skin.
After surgery she was limited in standing and walking. She was placed on a sedentary level for a period of time. He saw her May 11, 1994. The incision was healing well but she had a return of fluid in the area. She had “no real pain” at the time and no infection.
He saw her May 20, 1994. At that time the swelling had returned. He did not think it advisable to repeatedly aspirate the area. Instead, he recommended she go to the hospital for several days on strict bed rest toprevent the fluid from returning. She did not wish to be hospitalized at that time. He recommended she remain sedentary and not walk or stand excessively.
Dr. Butler next saw her on July 15, 1994. The swelling had increased slightly and the area was beginning to feel firm. He suggested a second operation. For this operation he recommended that Vanessa remain in the hospital for several days with a drainage tube. She had a sick child and did not want *988 to do this at that time. She complained of pain, tingling, and itching in the area. He told her to return in six weeks;
She returned August 26, 1994. She complained of a burning sensation. Her knee motion was normal. The area appeared firmer to touch. He discussed the options of living with the pain or having a second surgery. She chose surgery. He performed the second surgery on September 8, 1994. He still felt at this time the condition was related to the accident. He saw her on September 16, 1994. The swelling had improved but she complained of pain in the area of the incision. He told her to return in a week.
She returned on September 21,1994. The sutures were removed. She had some swelling. There was a small recurrence of fluid. He advised her to return in two weeks. She did not return until December 16,1994. She told him the swelling was subsiding and she was doing better. She had no pain. Dr. Butler noted slight swelling. He advised her to apply warm compresses and return in three to four months.
She returned January 30, 1995. She had no complaints of pain or swelling. However, Vanessa testified she always had pain when she saw Dr. Butler. On that visit Dr. Butler reported that her incision was non tender and she had full range of motion in the knee. He told her she had no limitations as far as activity and that she could return on an as needed basis.
| ipVanessa returned more than one year later, on March 6, 1996. She complained of pain in her lower thigh and knee which had increased the two-week period prior to this visit. She complained of pain and limping on walking and climbing stairs. However, she told him the pain was not on a daily basis. He related her complaints to the accident. There was no contradictory evidence to his testimony relating her continued complaints to the accident.
Dr. Butler explained:
... it appeared she had recurring hemato-mas of areas of swelling and incidence of swelling in that area. She had intermittent pain, which I was not surprised since she had had two previous operations. I expected that her pain would be chronic and intermittent on a long-term basis or for the foreseeable future at that time. There was a possibility that she might consider another surgical procedure; however, we had tried on several other attempts, specifically two times, and at least the swelling had partially returned.
He next saw her July 2, 1997. She complained of continued and nearly constant pain. She denied pain on sitting but complained of pain on walking. He could not detect any swelling in the area, but noticed that when he touched the area, her complaints of pain increased.
She had x-rays taken on June 6, 1997 which showed arthritic changes in the knee joint which he had noted in x-rays taken March 4, 1994. One possibility for her pain was scarring in the area as a result of the prior surgeries. He related her symptoms to the accident based on the history she gave him. He stated that more likely than not she would have pain for the rest of her life. She has a scar measuring four inches by one-half inch. He did not assign a disability to her injury nor has he given her any restrictions or limitation in activity.
The arthritic changes are in her right knee. He did not believe these changes were symptomatic. He did not know whether if she lost weight or obtained steroid injections the pain would lessen. Vanessa testified she is currently experiencing arthritic pain in the right knee but that area of arthritic pain is in a different location from the hematoma.
The general damages’ award was evidently based on the long-term, chronic nature of the pain since the trial judge referred to Dr. Butler’s “uncontradieted prognosis” that Vanessa would have chronic pain in her right leg for the remainder of her life.
Appellants argue the award is disproportionate to the injuries sustained in similar cases. InHowever,
... the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Each case *989 is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration ... [The Supreme Court] further disapproved of the use of a scale of prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular case ... the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck [v. Stevens, 373 So.2d 498 (La.1979) ] to the present case is that the discretion vested in the trier of fact is “great,” and even vast, so that an appellate comb should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular ease ...
Youn, supra at 1260-1261.
We adopt the reasoning in Youn, supra at 1261 and note its applicability herein:
... Many rational triers of fact could have decided that a lower award is more appropriate, but we cannot conclude from the entirety of the evidence in this record, viewed in the light most favorable to the prevailing party in the trial court, that a rational trier of fact could not have fixed the awards of general damages at the level set by the trial judge or that this is one of those “exceptional cases where such awards are so gross as to be contrary, to right reason.” Bartholomew v. CNG Producing Co., 832 F.2d 326 (5th Cir.1987).
MANIFEST ERROR/ABUSE OF DISCRETION: LOSS OF CONSORTIUM
Appellants contend that the only evidence set forth by. the plaintiffs regarding the loss of consortium claim was that Welton no longer enjoys activities with his wife to the extent done prior to the accident. However, loss of society and companionship is compensable. Seagers v. Pailet, 95-52 (La. App. 5th Cir. 5/10/95) 656 So.2d 700. Appellants further argue that $10,000 constitutes an abuse since a range of $1,000 to $3,000 would be more appropriate.
We find no manifest error in the trial judge’s award for loss.of consortium since both Vanessa and Welton testified that their relationship suffered a loss of companionship and society after the accident. Welton further testified that sexual relations dramatically decreased. This testimony was uncoii-tradicted and is consistent with Dr. Butler’s medical findings. | ^Considering the standard set forth in Youn, we find no abuse of discretion in the award of $10,000 for loss of consortium.
Accordingly, for the reasons stated, the judgment is affirmed at appellants’ cost.
AFFIRMED.

. In proceeding number 97-CA-1178, a consolidated lawsuit, Allstate Insurance Company filed suit to recover amounts paid for property damage to two vehicles involved in the accident. *983 Ingram also filed a reconventional demand seeking recovery for property damage to its vehicle. These two claims were settled prior to trial.

. He rendered judgment in favor of Vanessa for $92,203.02 and for Welton in the amount of $10,000.

. That statute provides:
A. No person shall turn a vehicle at an intersection unless the vehicle is in proper position upon the roadway as required in R.S. 32:101, or turn a vehicle to enter a private road or driveway, or otherwise turn a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety.
B. Whenever a person intends to make a right or left turn which will take his vehicle from the highway it is then traveling, he shall give a signal of such intention in the manner described hereafter and such signal shall be given continuously during not less than the last one hundred (100) feet traveled by the vehicle before turning.
C. No person shall stop or suddenly decrease the speed of a vehicle without first giving an appropriate signal in the manner provided herein to the driver of any vehicle immediately to the rear when there is opportunity to give such signal.
D.The signals provided for in R.S. 32:105(B) shall be used to indicate an intention to turn, change lanes or start from a parked position and shall not be flashed on one side only on a parked or disabled vehicle, or flashed as a courtesy or “do pass” signal to operators of other'vehicles approaching from the rear.'

. La. R.S.32:76(A)(2) provides:
A. No vehicle shall at any time be driven to the left side of the highway under the following , conditions:
(2) when approaching within one hundred feet of or traversing any intersection or railroad grade crossing ...

. The child was still born. We note it is undisputed the death of the child was unrelated to the accident.

. The hospital medical record reveals that on February 12, 1994 her treating physician wrote that she was under observation for 48 hours before release, due to contractions. She was observed by Dr. Stephen Fortunato and given medication.
The record from the' hospital further shows she was placed on a fetal heart monitor and tocody-nometer (placed on top of the uterus) on February 11, 1994 in order to aid in evaluating the labor process. She was monitored for contractions on February 11, 1994. Nurses’ notes indicate irregular contractions were being recorded.