720 So.2d 166 (1998)
Janet P. GENUSA, individually and as the Wife of Anthony Genusa, individually and as the Husband of Janet P. Genusa
v.
Michael J. ROBERT, Medical Heritage, Inc. and Interstate Fire and Casualty.
No. 98-CA-449.
Court of Appeal of Louisiana, Fifth Circuit.
October 14, 1998.
Rehearing Denied November 17, 1998.
Christopher E. Lawler, Christopher P. Lawler, Lawler & Lawler, Metairie, for defendants-appellants Allstate Insurance Company.
Scott W. McQuaig, McQuaig & Stelly, Metairie, for appellants-appellees Janet P. Genusa and Anthony Genusa.
Before GRISBAUM, J., and THOMAS C. WICKER, Jr. and NESTOR L. CURRAULT, Jr., JJ. Pro Tem.
NESTOR L. CURRAULT, Jr., Judge Pro Tem.
Defendant-appellant Allstate Insurance Company appeals a judgment of the district court in favor of plaintiffs Janet Genusa, in the amount of $110,000.00 and Anthony Genusa in the amount of $120,000.00. In response, plaintiffs aver that the court erred in refusing to award punitive damages for arbitrary and capricious refusal to settle, and in awarding inadequate damages to Mrs. Genusa.
Plaintiffs were injured in an automobile accident on April 16, 1993, and filed suit thereon against various parties. Made defendants *167 were the driver of the other vehicle, Michael Robert; the automobile's owner, Medical Heritage Inc.; the insurer of the Robert vehicle, Interstate Fire and Casualty; and Allstate Insurance Company, plaintiffs' uninsured/under-insured motorist carrier.
Plaintiffs settled their claims with the tortfeasor and Interstate. Mrs. Genusa received $80,000.00 and Mr. Genusa received $95,000.00, all under Interstate's policy with limits of $100/300,000.00. Those defendants were dismissed from the lawsuit; therefore, at trial the remaining issues were the additional damages due, if any, from Allstate. The original petition requested damages for physical pain and suffering, mental anguish, permanent disability, loss of income, loss of earning capacity, and loss of consortium.
At trial, the negligence of the tortfeasors was stipulated, along with the amounts of the settlement figures. It was further stipulated that Allstate would receive a credit of $100,000.00 for each plaintiff. Plaintiffs orally moved to amend their petition to include a claim for penalties and attorney's fees, alleging that Allstate was arbitrary and capricious in failing to make a UM tender. The court denied the motion.
Trial on the merits proceeded. At the conclusion of trial, a judgment was rendered in favor of Mrs. Genusa for $25,025.43 in medical expenses; $2,500.00 in lost wages; $5,000.00 for loss of consortium; and $77,474.57 in general damages. Judgment in favor of Mr. Genusa was granted in the amount of $12,661.27 for medical expenses; $10,000.00 for lost wages; $5,000.00 for loss of consortium; and $92,338.73 in general damages. As a result of the stipulations relative to the Interstate policy limits, Allstate was ordered to pay $10,000.00 to Mrs. Genusa and $20,000.00 to Mr. Genusa. A motion to reconsider the oral amendment, which had been taken under advisement, was denied. It is this judgment which is currently on appeal before us.

EVIDENCE AND TESTIMONY
Mrs. Genusa testified that she was knocked out in the accident, and that she and her husband were taken to the emergency room at East Jefferson General Hospital. She could not move her neck and had pain in her shoulders and arms. She saw Dr. Robert Shackleton, an orthopedic surgeon, who recommended therapy; the therapy did not really help, and she began to experience tingling and numbness in her arms. She had pain in both shoulders at that time, but the left shoulder was not nearly as bad as the right. She did not feel that Dr. Shackleton was helping her. A friend of hers suggested that she see a vascular surgeon, Dr. Warren Gottsegen, who examined her and diagnosed a "thoracic syndrome." She then stopped seeing Dr. Shackleton. On the advice of her husband she also saw Dr. Toussaint LeClerq for a second opinion. Mrs. Genusa continued with physical therapy, but continued to get worse. Dr. Gottsegen then recommended surgery, which surgery she underwent at Doctor's Hospital. He first operated on the right side, and several days later on the left. During the surgery she suffered a collapsed lung, and was in the hospital for one week. She had a lot of pain for the first month, then it gradually improved. However, today she still has numbness on her left side from the middle of her arm to the armpit, which is a constant irritation, but she does not want to undergo further surgery. Plaintiff never had any of these problems before the accident; although she had been in another accident ten years before, she had not suffered any long term injuries. She has returned to work. She testified that her personal relationship with her husband has suffered. At least four times a week she wakes up and he is not in the bed with her.
The total of Mrs. Genusa's medical bills fromthis accident was $25,025.43.
Mr. Genusa testified that at the time of the accident, he was a Lieutenant Colonel with the Louisiana State Police, but he retired in April of 1997.[1] Following the accident, he was taken to East Jefferson General Hospital *168 with complaints of dizziness and pain in his shoulder, neck and back. He was not admitted, but x-rays were taken and he was referred to a physician. He saw Dr. Shackleton, who prescribed medicine and physical therapy. He felt that Dr. Shackleton was insensitive to his concerns, because he would complain about his shoulder and neck, but the doctor treated him only for his back pain. He went to see Dr. LeClerq, who told him he would need surgery. He obtained another opinion from Dr. Lucien Miranne, also a vascular surgeon, who prescribed home therapy and medication. The therapy did not help and was discontinued. Plaintiff underwent two MRI's and two mylegrams. Dr. Miranne advised surgery on his neck. Mr. Genusa has not had any surgery, and continues to suffer. There are risks involved with surgery which he feared. In addition, at the time surgery was recommended, there was the possibility of a promotion and he did not want to be interviewed for the position while recuperating. Further, he had heard of similar operations with bad results.
Mr. Genusa has neck pain every night, which wakes him up three or four nights a week. He missed 45 days of work due to the accident, for which he used accumulated sick leave. Prior to the accident, he did not have similar symptoms in his neck and the earlier auto accident had not caused any significant difficulties. Everything he and his wife did, including sexual activity, was hampered because of the pain. They had played with their grandchildren, which he now has difficulty doing; he had started playing golf prior to the accident, and has not been able to do so since. He previously enjoyed working in his yard, which he can no longer do. Sometimes the pain in his lower back bothers him, and sometimes it is excruciating for long periods of time.
He used to jog five miles a day on four days a week, had a weight lifting program, and worked on a stair-step machine. He has not been able to do these exercises since, and has gained 22 pounds.
The amount of Mr. Genusa's medical bills associated with the accident was $12,665.27.
On cross-examination, Mr. Genusa stated that after the accident, he drove from Metairie to Baton Rouge to work, and received several pay increases and satisfactory job performances before he retired.
Dr. Robert Shackleton treated both plaintiffs within six days following. the accident. Mr. Genusa complained of pain in his neck, and pain from the right shoulder to mid-arm. He had one or two episodes of numbness from the right shoulder down to the elbow. He also had pain in his lower back. Mr. Genusa related that he had been diagnosed with degenerative disc disease about 15 years earlier, but had had no problems with it. After examining plaintiff and reviewing xrays taken at East Jefferson General Hospital, Dr. Shackleton felt that he had a sprain or strain to his neck, back, and right shoulder. On his next visit, Mr. Genusa was having more pain, and his symptoms were worse. He was placed on bed rest and given pain medication. His primary complaint at that time was his lower back, and he did not complain at that time of neck pain. Ultimately, a lumbar MRI was performed; the doctor saw the test report (not the film itself), which indicated a moderate central disc herniation. Mr. Genusa continued to complain of low back and left leg pain. He did not return after May, 1993. Dr. Shackleton felt that the plaintiff's symptoms were related to the accident, and that the cervical strain had resolved around January 21, 1993. He could not state that the disc herniation was caused by the accident.
Mrs. Genusa was wearing a cervical collar when she came in, and she complained of neck pain, and shooting pain across her anterior chest from her right shoulder. She had pain between her shoulder blades to the neck, and stated that her right shoulder was weak and her right arm heavy. She was sore all over, and slept in a reclining chair. She had a history of backache eight years before, which was stress related and had resolved. After examining her, Dr. Shackleton diagnosed a sprain or strain to her neck, back, and right shoulder. The physician recommended that she take off the cervical collar at times, and return to determine further treatment. She returned in one week with increased shoulder pain, having stopped some medication and having returned to *169 work. Her right arm felt weak and sometimes dead. Dr. Shackleton felt she might have tendinitis in addition to the strain, and gave her anti-inflammatory medication.
When she returned several weeks later, her shoulder was better, but weak, and she continued to have neck pain. Dr. Shackleton found that she continued to have slow but steady improvement. In a subsequent visit, Mrs. Genusa complained that after pruning her roses for about 10 minutes, she had extreme pain across her upper back; x-rays taken then showed no fracture or dislocation. A stretching and strengthening program was recommended. In a return visit of April, 1993, Mrs. Genusa said that she was undergoing physical therapy, but that she was no better and still had pain; further, she experienced tingling in her right arm. Dr. Shackleton still felt that her complaints were muscular, and put her back on an anti-inflammatory. Mrs. Genusa did not return to his office. The doctor felt that Mrs. Genusa's symptoms were caused by the accident.
On cross-examination, the doctor stated that Mrs. Genusa did not exhibit findings of thoracic outlet compression syndrome. To test for this problem, an MRI and a nerve conduction study is usually done and if she had continued in his care and had not improved, he might have ordered such MRI.
Dr. Toussaint LeClercq, certified as an expert in neurosurgery, testified that Mrs. Genusa was referred, according to his file, by Dr. Shackleton. He first saw her in June of 1993, at which time she complained of symptoms of neck and bilateral shoulder pain, and numbness. Dr. LeClerq wanted to rule out the possibility of a herniated disc in her neck, and ordered a cervical MRI. That test showed degenerative changes, called spondylosis, at several levels, which changes probably preexisted the accident; however, the condition became symptomatic due to the accident. Mrs. Genusa had a degenerative disease of the spine and had developed cervical radiculopathy. Dr. LeClerq sent a report to Dr. Shackleton, and did not see the plaintiff again.
On cross-examination, Dr. LeClerq testified that plaintiff told him that she had the (bilateral) shoulder pain since the accident. He did not examine her for, nor did he diagnose, a thoracic outlet compression syndrome of the right shoulder. Dr. LeClerq would defer to Dr. Gottsegen's opinion as to that syndrome.
Dr. LeClerq also saw Mr. Genusa in June of 1993. At that time, Mr. Genusa complained mostly of neck pain, but also suffered from lower back and leg pain. After examination and viewing the MRI films and reports, Dr. LeClerq thought that plaintiff had herniations of both lumbar and a cervical disc, as well as spondylosis. The doctor recommended removal of the cervical disc and a fusion. He also recommended a percutaneous discotomy on the herniated lumbar disc, a procedure which allows removal of the disc without open surgery. For the cervical fusion, a hospitalization of two days is required with a period of six to eight weeks and there is usually a 10-15% anatomical disability. Following a second visit in July of 1993, Mr. Genusa did not return. Dr. LeClerq related the symptoms to the auto accident.
Billy Naquin, a licensed physical therapist, was recognized as an expert in the field. He testified that Mr. Genusa had nine physical therapy treatments for low back pain. These treatments consisted of moist heat, massage, and exercise. Mr. Genusa reported feeling better after some treatments; however, he did not keep all of his scheduled appointments, and discontinued treatment of his own accord. With regard to Mrs. Genusa, Mr. Naquin provided 15 therapy sessions of moist heat, massage to the cervical spine, and exercises. Her main complaints were on the right shoulder and arm. Initially, she improved, but near the end of her treatment she had increased complaints of pain with numbness in both arms.
Dr. Gottsegen testified as an expert in the field of vascular surgery. Mrs. Genusa complained of bilateral shoulder pain, which pain was worse on the right side. After examining her, he found very obvious objective evidence of a thoracic outlet syndrome, a condition in which the circulation in the nerves to the upper extremities are compressed as a result of chronic muscle spasm in the neck. Nerve conduction studies confirmed the diagnosis. *170 Initially he prescribed anti-inflammatory medication and therapy. Rather than progress, her condition deteriorated and surgery was performed. This surgery consisted of a rib resection, in which part of the rib was removed, and partial removal of the scalene musculature as well. Following surgery, she had some residual problems at first, including numbness. He has not seen her since November of 1993. The numbness in her arm is probably permanent. Dr. Gottsegen considered the bilateral thoracic outlet syndrome to be a result of the accident. He did not assign a functional disability to Mrs. Genusa.
On cross-examination, Dr. Gottsegen stated that the thoracic outlet syndrome can develop without apparent cause, but twothirds to eighty per cent of the cases result from trauma. Symptoms can develop from six to eight months following a trauma.
Dr. Lucien Miranne testified by video deposition, a copy of which, along with the transcript, was entered into evidence. Dr. Miranne, a neurosurgeon, examined Mr. Genusa in July, 1993. At that point in time, he complained primarily of neck pain and headache, but also had intermittent bilateral shoulder pain. He further complained of low back pain, and weakness in his arm associated with the neck problems. After examination and consideration of the cervical MRI, Dr. Miranne felt that there was a narrowing of the nerve channels in plaintiff's neck, and that he suffered from lumbar and cervical spondylosis, and recommended a further workup. Some of the arthritic changes probably predated the accident in question. However, the already compromised areas in the spine could make the nerves more susceptible to injury in a trauma. Dr. Miranne ordered a myelogram and a CAT scan. The tests indicated a bulging lumbar disc, and encroachment at two levels in the cervical region. Cervical traction and medications were recommended, but did not help the symptoms. Later, a nerve conduction study and an EMG showed no significant overall changes. Surgery was eventually recommended.
Dr. Miranne followed plaintiff's case for two years, and felt that plaintiff would either have to live with the symptoms or have surgery. He was of the opinion that the symptoms of which Mr. Genusa complained, and for which he treated plaintiff, were consistent with the accident. However, on cross-examination the doctor admitted that he had no tests predating the accident to compare, so that it was possible that no physiologic change in plaintiff's spine was attributable to the accident. Further, he stated that the accident could have had no effect on those spondylitic changes.
The parties stipulated:
(1) Mrs. Genusa missed 200 hours of work from the date of the accident to the trial and she earned $14.00 per hour; she was paid using accumulated sick leave;
(2) Mrs. Genusa earned $30,000.00 per year;
(3) Mr. Genusa earned $60,000.00 per year, and used accumulated sick leave for the time for which he was absent from work.

ANALYSIS

DAMAGES
In considering the amount of general damages, the Louisiana Supreme Court explained in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261, (La.1993) that the trier of fact is vested with vast discretion and noted that it is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Appellants argue the award is disproportionate to the injuries sustained in similar cases. The Youn court stated:
... the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration ... [The Supreme *171 Court] further disapproved of the use of a scale of prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular case... the theme that emerges from Gaspard v. Le Maire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck v. Stevens, 373 So.2d 498 (La.1979), to the present case is that the discretion vested in the trier of fact is `great,' and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case ...
Youn, supra at 1260-1261. See also Allstate Ins. Co. v. Reynolds, 97-1178 (La.App. 5 Cir. 5/13/98), 712 So.2d 981.
The present case involved injuries to Mrs. Genusa which, after months of pain, discomfort, and therapy, required two surgeries. One surgery resulted in a collapsed lung and Mrs. Genusa was hospitalized for one week. She suffers permanent numbness, and testified as to several elements of loss of consortium. She also had loss of income as well as extensive medical bills. Under all the particular facts and circumstances of this case, we view the award as reasonable, and do not find that the trial court abused its discretion.
Similarly, although Mr. Genusa did not undergo surgery, he has continued to experience pain and discomfort in his neck and back which he described as often excruciating. If he does not have surgery, he will have to live with this pain for the rest of his life. He underwent several medical tests and accumulated substantial medical expenses, and lost a large amount of income. Our consideration of the facts as testified to by the witnesses convinces us that considering the effect of the injury on Mr. Genusa, the award of the trial court was reasonable and not an abuse of discretion. Therefore we decline to disturb the damage award in favor of either plaintiff.

AMENDMENT OF THE PLEADINGS
In the present case, the plaintiffs did not originally plead that Allstate was arbitrary and capricious in refusing to tender payment under the policy. However, pursuant to a pre-trial order issued by the court, the parties submitted a joint pre-trial report which listed as a disputed issue of law, whether plaintiffs are entitled to punitive damages from Allstate pursuant to La.R.S. 22:1220, which provides that an insurer has an affirmative duty to adjust claims fairly and properly and to make a reasonable effort to settle. Counsel for both parties signed the order, which was filed into the record. This is the only pleading in the record relative to that item of damages.
This court, in Winter v. F.A. Richard & Associates, Inc., 95-578 (La.App. 5 Cir. 11/28/95), 665 So.2d 611, held that a question of the applicability of credits due was placed at issue in the joint pre-trial order and was thus tried by express consent under La.Code Civ.Pro. art. 1154[2]. See also Nichols v. Stone Container Corp., 552 So.2d 688, (La. App. 2 Cir.1989) wherein the court stated:
We have no difficulty concluding that the plaintiff was not surprised by the issue and that the inclusion of the issue in the pretrial statement entered into evidence by stipulation controls the subsequent course of action of the case authorizing evidence on the issue of the plaintiffs negligence. Similarly, the plaintiff's corollary argument that the trial court abused its discretion by *172 ordering the defendant to amend its pleadings to conform to the evidence is to no avail, as the pretrial order entered into the record by stipulation is controlling.
Nichols, supra at p. 691, citing Austrum v. City of Baton Rouge, 282 So.2d 434 (La. 1973).
Therefore, it was error for the court to deny plaintiff's motion to amend the pleadings, as the matter should have been tried by the express consent of the parties. Because the trial court erred in this respect and did not consider the issue, we must make a de novo review of the record to determine whether Allstate was arbitrary and capricious under R.S. 22:1220.
La.R.S. 22:1220 reads in pertinent part:
A. An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A:
. . . . .
(5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.
C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings.
This statute has been construed to be penal in nature and should be strictly construed. Jeanpierre v. Mikaelian, 97-1850 (La.App. 4 Cir. 2/25/98), 709 So.2d 915; Ramirez v. Ware, 28,879 (La.App. 2 Cir. 9/25/96), 680 So.2d 1302.
In McDill v. Utica Mut. Ins. Co., 475 So.2d 1085 (La.1985), the Louisiana Supreme Court recognized the insurer's duty under its policy provisions to unconditionally tender a reasonable amount to its insured where it is shown that its insured is not at fault, the other driver was underinsured/uninsured and that its insured was damaged.
... the insurer cannot stonewall the insured because the insured is unable to prove the exact extent of his general damages. General damages by their very nature are subjective and incapable of exact computation. This [tender] amount would be unconditionally tendered to the plaintiff not in settlement of the case, but to show their good faith in the matter and to comply with the duties imposed upon them under their contract of insurance with the insured. The amount that is due would be a figure over which reasonable minds could not differ.
McDill, supra.
In McDill, the court reinstated an award of penalties and attorney fees where the insurer made no unconditional tender. "In this case, had Utica tendered some reasonable amount of the general damages, they would not have been arbitrary and capricious and the penalty provision would not apply." Id.

McDill and its progeny make clear that the reason for an unconditional tender by the insurer is to fulfill its duty of good faith to its insured. It is not a mechanism to force a settlement. The amount tendered has been described as an `undisputed amount,' Patin v. Imperial Lloyds Ins. Co., 95-841 (La.App. 3rd Cir. 1/17/96), 670 So.2d 238 and `the figure over which reasonable minds could not differ.' McDill v. Utica Mut. Ins. Co., supra. If there is a reasonable dispute between the insurer and the insured as to the amount of a loss, the insurer's refusal to pay is not arbitrary, capricious or without probable *173 cause. Patin v. Imperial Lloyds Ins. Co., supra; Thibodeaux v. USAA Cas. Ins. Co., 93-2238 (La.App. 1st Cir. 11/10/94), 647 So.2d 351.
Molony v. USAA Property and Cas. Ins. Co., 97-1836 (La.App. 4 Cir. 3/4/98), 708 So.2d 1220.
Whether a refusal to pay a claim is arbitrary, capricious, or without probable cause hinges on the facts known to the insurer at the time of its refusal to pay the claim. Wells v. Houston, 95-202 (La.App. 3 Cir. 6/7/95), 657 So.2d 474; writ denied, 95-1733 (La.10/13/95), 661 So.2d 500.
In the present case, the evidence submitted on proffer by plaintiffs shows that Allstate was aware of the extent of plaintiffs' injuries at the time that it refused to tender payment. Allstate pleaded that the settlements with the tortfeasor would not have been made for less than the policy limits if the claims had been worth more. These are the same injuries which the trial court valued at $30,000.00 more than the settlement made for Mrs. Genusa, and $25,000.00 more than the settlement for Mr. Genusa, which award we have affirmed herein above. The showing of good faith and fairness required by R.S. 22:1220 on the part of Allstate could not hinge, in the present case, on the amount of the prior settlements. To permit it to do so would be to chill the concept of settlement and compromise, which is favored under the law. Under the circumstances, the failure of Allstate to tender a reasonable amount of general damages for the extensive injuries suffered by their insured renders defendant arbitrary and capricious.

DECREE
For the foregoing reasons, the judgment in favor of Mrs. Genusa for $110,000.00, subject to a credit of $100,000.00, and the judgment in favor of Mr. Geunsa for $120,000.00 also subject to a $100,000.00 credit, is affirmed. The judgment denying plaintiffs' motion to amend its pleadings is reversed, and the defendant Allstate is found to be arbitrary and capricious in its refusal to make a good faith tender. Allstate is assessed a penalty of $5,000.00 in favor of Mrs. Genusa, and $5,000.00 in favor of Mr. Genusa. In all other respects the judgment is affirmed. Allstate is assessed all costs of these appellate proceedings.
AFFIRMED IN PART; REVERSED IN PART AND RENDERED.
NOTES
[1] At the time of trial, he was employed with the Jefferson Parish Sheriff's Office in charge of security at the airport.
[2] That article reads as follows:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleading. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby, and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense on the merits. The court may grant a continuance to enable the objecting party to meet such evidence.