475 So.2d 1085 (1985)
Stanley D. McDILL,
v.
UTICA MUTUAL INSURANCE COMPANY.
No. 85-C-0610.
Supreme Court of Louisiana.
September 10, 1985.
*1087 Paul H. Due, Charles William Roberts, Due, Dodson, deGravelles, Robinson & Caskey, Baton Rouge, Calvin C. Fayard, Jr., Fayard, Morrison & Kuhn, Denham Springs, Joseph H. Simpson, Simpson & Schwartz, Amite, for plaintiff-applicant.
Robert E. Kerrigan, Jr., Melanee A. Gaudin, Deutsch, Kerrigan & Stiles, New Orleans, for defendant-respondent.
BLANCHE, Justice.
On March 30, 1981, plaintiff, Stanley D. McDill, age 26, was involved in a motor vehicle accident with Dale M. Latino at the intersection of Louisiana Highways 935 and 431 in Ascension Parish. McDill was operating a trailer-truck owned by his employer, J.W. Cade, and insured by Utica Mutual Insurance Company. The policy provided $100,000 uninsured/underinsured motorist coverage. The 1974 Grand Prix automobile driven by Latino was covered by a liability insurance policy issued by Southern Farm Bureau Casualty Insurance Company with only an applicable $10,000 policy limit. The accident occurred at about 2:45 a.m. and was caused by 17 year old Latino who ran a stop sign governing his direction of travel. McDill was hauling 23 yards of sand when Latino's car struck the trailer-truck just behind the cab. The moment the truck was hit, it caught fire. In an effort to avoid the collision, McDill pulled his rig to the right, lost control and had his truck flip over in the ditch. He managed to crawl through the windshield of the cab. Following the accident, McDill was taken by ambulance to the East Ascension General Hospital Emergency Room where a triangular laceration of his scalp was stitched and x-rays were taken of his neck and upper back.
Approximately 12 hours after the accident, McDill was seen by his family doctor, Dr. Joseph L. Mass. He complained of soreness in his neck and ribs. Dr. Mass found in addition to the laceration on his scalp, a large abrasion over his right upper back, a large bruise on his right thigh and marked congenital scoliosis of the upper spine. Dr. Mass concluded that McDill took a significant amount of trauma to the head at that time. He prescribed antibiotics and a soft cervical collar. Dr. Mass saw McDill again on April 2 and 9, 1981, noting only tenderness of his right lower ribs, soreness of his neck and problems with his scalp laceration.
On April 20, 1981, Dr. Mass referred McDill to Dr. John Fraser, a orthopedist in Baton Rouge, to evaluate his scoliosis and clear him to return to work. After examining McDill on May 2, 1981, Dr. Fraser reported that McDill had "neck and back" complaints and had probably suffered a neck strain secondary to the accident. The doctor concluded, however, that he was ready to return to work.
McDill stated that his back had always bothered him after the accident but since he had so much time off, he had to go back to work to pay the utility and grocery bills for his wife and three children. McDill got the same type job, hauling sand and gravel for Raymond McMorris. McDill had a good reputation with Mr. McMorris as a good and steady worker. Because McMorris *1088 knew McDill's back was giving him problems, all he was required to do was drive and occasionally grease the truck. McDill was not to change tires or do any heavy lifting. McDill developed severe headaches which, together with his back pains, forced him to return to Dr. Mass on June 13, 1981. McDill stated that he had never had any significant headache problems prior to the accident which, unlike the present situation, could not be relieved by taking aspirin. Dr. Mass' impression was that he had post-traumatic headache. He was also complaining of pain between his shoulder blades. Dr. Mass continued him on his same medication and ran an EEG.
Dr. Mass did not see Mr. McDill again until November 23, 1981. McDill complained of having severe back pain for five days. This was eight months after the accident. According to Dr. Mass, McDill was in marked distress. He described his pain as radiating down both legs. Some maneuvers indicated that he might have a herniated disc. X-rays of McDill's lower back were taken for the first time. They were evaluated as normal by Dr. Mass. However, he believed that this did not really mean anything because x-rays would not show a herniated or ruptured disc. He then referred McDill to Dr. Andrew Kurcharchuk, an orthopedic surgeon.
On December 2, 1981, Dr. Kurcharchuk saw Mr. McDill for the first time. He was complaining of excruciating low back pain. After examining his patient, Dr. Kurcharchuk concluded he had all of the classic signs of a herniated disc at the L-5/S-1 level. The doctor had McDill admitted to Our Lady of the Lake Hospital in Baton Rouge on December 14, 1981, for a myelogram and definitive treatment. Dr. Kurcharchuk referred McDill to a neurosurgeon, Dr. George Lohmann, who did the myelogram and removed a ruptured disc on December 16, 1981.
McDill initially instituted suit against Latino and Southern Farm Bureau in the 23rd Judicial District Court. This suit was subsequently settled for the $10,000 policy limit on June 11, 1982. McDill reserved all rights against Utica.
On March 12, 1982, McDill filed suit against Utica for the $100,000 underinsured motorist coverage. McDill also asked to recover penalties and attorney's fees in the event that Utica arbitrarily or without just cause failed to pay or tender to plaintiff either the full amount of the available policy limits, or alternatively, the amount which it would undisputedly owe considering the nature of plaintiff's injuries and damages, the absence of any issue of liability herein and the limited amount of available liability insurance coverage.
It also had been determined that McDill's employer at the time of the accident was without worker's compensation coverage and in the process of filing for bankruptcy.
Utica answered alleging that McDill was contributorily negligent and that it could not be held liable for penalties and attorney's fees under La.R.S. 22:658[1] because it never received "satisfactory proofs of loss". Utica requested a jury trial on all *1089 issues except the question of penalties. The parties later stipulated that this issue would be decided by the trial judge.
The parties agreed that the first notice Utica was given of the claim was the filing of suit on March 12, 1982, alleging that McDill had medical expenses of $25,000, lost wages of $300,000 and personal injury damages (including permanent residual disability, pain and suffering and mental anguish and distress) of $600,000.
After trial on the merits, the jury found McDill free of contributory negligence and awarded $250,000 in damages.
The trial judge found Utica's refusal to pay to be arbitrary and capricious and assessed a 12% penalty on the total amount and $40,000 in attorney's fees.[2]
The five judge panel of the appellate court, 465 So.2d 19, voted four to one to reverse, holding that "McDill did not satisfy the statutory and jurisprudential requirements of submitting `satisfactory proofs of loss' to Utica of his legal entitlement to damages and the extent of those damages." This finding resulted from an examination of the correspondence between plaintiff and defendant. What concerned the appellate court was the absence of anything tending to establish the extent of plaintiff's damages, an objective legal cause for the surgery or the cost of the surgery. The appellate court found "that if `satisfactory proofs of loss' is to have any meaning at all in an underinsured/uninsured context, it must be that quality of proof which enables the insurer to realize that it is probably liable for some part of the policy's coverage, and that quality of proof which enables it to reasonably determine the dollar amount of benefits to be paid." [emphasis added]. We agree with that statement but reverse as to that court's ultimate conclusion.
In plaintiff's writ application to this court he complains that (a) there was no manifest error in the trial court's reasons for judgment finding Utica to be arbitrary and capricious for failing to tender the insurance proceeds prior to trial and (b) alternatively, Utica was arbitrary and capricious after the trial court's judgment for failure to tender the proceeds even though Utica took a suspensive appeal but failed to argue anything but the issues of penalties and attorney's fees.
La.R.S. 22:658 has been held to apply to uninsured or underinsured motorist's claims. Hart v. Allstate Insurance Company, 437 So.2d 823 (La.1983). A claimant for penalties and attorneys fees under the statute has the burden of proving that the insurer failed to pay the claim within 60 days after receiving "satisfactory proof of loss" of the claim, and that the insurer was arbitrary or capricious in failing to pay. A "satisfactory proof of loss" within the meaning of La.R.S. 22:658 is that which is sufficient to fully apprise the insurer of the insured's claim. Hart v. Allstate Ins. Co., supra. To establish a "satisfactory proof of loss" of an uninsured/underinsured motorist's claim, the insured must establish that the insurer received sufficient facts which fully apprise the insurer that (1) the owner or operator of the other vehicle involved in the accident was uninsured or underinsured; (2) that he was at fault; (3) that such fault gave rise to damages; and (4) establish the extent of those damages. Hart v. Allstate Ins. Co., supra.
The general issue put before us is whether the plaintiff carried his burden of providing Utica with "sufficient proofs of loss" under the statute. The specific issue is whether McDill fully apprised Utica sufficiently of his extent of general damages.
Underinsured Status of Dale M. Latino
Paragraph number 5 of plaintiff's petition alleges that since Latino's liability policy issued by Southern Farm is only for the amount of $10,000, the situation was created in which the plaintiff's injuries and damages reasonably exceeded the available *1090 liability insurance coverage. Utica responded on 5/21/82, to plaintiff's request for various admissions, that "to the best of its knowledge, this was the only liability policy covering the Latino vehicle."

Latino's Fault
Utica alleges in its answer that McDill's negligence contributed to the accident. However, the record is absent of any evidence produced by Utica or produceable by Utica to substantiate this allegation. In fact, the testimony at trial of Arnette Heintze, the State Trooper investigating the accident, revealed there were no facts at all indicating McDill's fault. Also, the diagram rendered by the State Trooper, which plaintiff submitted at trial, was further support for this contention.
While the roads were in good condition, the view of the intersection for McDill was partially obstructed by some bushes. It was pitch black at 2:45 a.m. and the first thing McDill saw was the headlights of Latino's auto a few feet from his truck. According to McDill, Latino was going so fast he didn't even "check" his brakes. The police report revealed that McDill was traveling at or below the 55 MPH speed limit and that Latino, who had been drinking, was traveling about 50 MPH.
McDill testified that he knew that the intersection was dangerous and was even paying close attention as he approached it that night. Accordingly, in this court's mind, the issue of contributory negligence was never a serious defense.

CAUSATION
Utica claims that satisfactory proof of loss was never established because there were reasonable grounds to doubt that the accident actually caused the disc injury.
On May 20, 1982, McDill, in his requests for admissions directed to Utica, asked defendant to admit that there was not an evidentiary basis for denying that the surgery performed upon plaintiff was, from the standpoint of reasonable medical probability, generally related to injuries sustained by plaintiff in the accident. In Utica's supplemental answer to this particular request for admission on June 3, 1982, defendant admitted that it did not at that time have any substantial basis for denying that the surgery, according to Mr. McDill's history to the physicians, was related to the accident. However, Utica stated that it had not had an opportunity to fully investigate this matter. Utica also stated that it understood plaintiff was involved in a vehicular accident subsequent to March 30, 1981, and had held various rigorous employments following the accident without evidence of substantial back injury.
Utica had an ample opportunity to investigate this matter well before the trial date. They deposed only one person, McDill, and they called only one witness at trial. At trial, Utica attempted to elicit testimony from Dr. Mass relating the back injury to the accident. Dr. Mass preferred to refer that question to the specialists.
Utica then pointed out that the operating surgeon, Dr. Lohmann, had not specifically attributed the disc surgery to the accident in his report. Dr. Lohmann's conclusion that McDill's low back surgery was the result of the accident was based on McDill's statements. When asked by counsel for Utica to explain to the jury why the disc injury did not manifest itself until eight months after the accident, the doctors stated that this was the common history for such an injury. He explained that initially, there would be a tearing of the annulus, the disc forming the circumference of an intervertebral fibrocartilage. This usually causes some back pain but rarely will it cause, at that time, any radicular pain which indicates a rupture of a disc. Usually the pain will resolve itself when the injured party lies down or takes it easy. The pain may persist for a while before it reappears. There is an inner jello-like material that eases out to put tension on the annulus fibrosis, or the ring of hard cartilage. This continues until the disc finally ruptures causing the radicular pain in the leg. This process, according to Dr. Lohmann, may occur immediately, which is usually only in extremely severe cases and *1091 very unusual, or it may take six months, a year, a year and a half and sometimes as often as two or two and a half years later before there will be radicular symptoms indicating a ruptured disc.
Dr. Lohmann's testimony is consistent with McDill's statements at trial that his back had always bothered him after the accident. Specifically, McDill stated that his back started hurting him within a week to ten days after the accident. Some days he said were better and some were worse.
Dr. Kurcharchuk testified that 76% of patients suffering from herniated discs do remember the "one injury" attributable to their pain. He described McDill's trauma in the accident as being moderately severe. When asked why it took so long for the disc to rupture, he explained the body initially attempts to heal itself, but all that it takes is some additional minor percipitating trauma to trigger the ruptured disc.
The subsequent accident Utica refers to was not an intervening cause to plaintiff's back injury. As McDill was exiting the Sunshine Bridge, a tire bolt broke on the trailer causing the back tandem of the trailer to go around, but not completely out from under the rig. McDill simply stopped the truck, without making contact with anything, and called a wrecking service.
It is this court's opinion that there is not one shred of evidence to relate plaintiff's back injury to anything other than the accident on March 30, 1981.

Extent of Damages
The one true issue presented in this case is whether plaintiff had fully apprised Utica as to the extent of his general damages. Plaintiff had $8,095.72 worth of medical damages and, as stated above, recovered the $10,000 liability limits under the Latino policy. Defendant knew early on in these proceedings, at least by the time of McDill's deposition on August 4, 1982, that there was only $10,000 of available underlying bodily injury coverage.
After the deposition, Utica knew the claim, the basis for the claim and the doctors involved. It then became necessary for Utica to determine whether there would be a legitimate basis for defending not paying at least what it considered to be undisputed in order to avoid being arbitrary and capricious. The evidence showed that the defendant knew that the underinsured motorist was negligent and absolutely no evidence whatsoever was developed to suggest that plaintiff was in any way contributorily negligent. Defendant further knew, and indeed even admitted, that it had no evidence to support any contention that the disc surgery which plaintiff had to undergo was not causally related to the injuries sustained in the accident. In fact, Utica only deposed the plaintiff and only called one witness at trial.
The fact that Utica's defenses were fruitless became evident to them at least by the time they received plaintiff's letter transmitting the operating surgeon's report on October 29, 1982. This was more than 60 days before trial. Additionally, since plaintiff's special damages exhausted almost all of the $10,000 primary coverage, his general damages for disc surgery had to have grossly exceeded that amount and this should have been obvious to Utica.
If the insured has shown that he was not at fault, the other driver was uninsured/underinsured and that he was in fact damaged, the insurer cannot stonewall the insured because the insured is unable to prove the exact extent of his general damages. General damages by their very nature are subjective and incapable of exact computation. To accept the defendant's position that no amount must be tendered unless the exact extent of general damages is proven renders the 4th element of the Hart test meaningless as it places an impossible burden on the plaintiff prior to going to trial. If the first three elements of the Hart test are satisfied and the insured has made a showing that the insurer will be liable for some general damages, the insurer must tender the reasonable amount which is due. This amount would be unconditionally tendered to the plaintiff not in settlement of the case, but to show *1092 their good faith in the matter and to comply with the duties imposed upon them under their contract of insurance with the insured. The amount that is due would be a figure over which reasonable minds could not differ.
In the present case as pointed out by the court of appeal, there was definitely a dispute over the exact extent of the plaintiff's injuries.[3] However, there is little question that Utica had some liability to the insured as a review of the record convinces this court that plaintiff's claim was clearly worth more than the $10,000.00 which was the primary coverage on Latino's policy.[4]
It is true that if Utica had been provided with every medical bill plaintiff had concerning the accident and surgery, they would have been in the best position to evaluate McDill's injuries. However, in this particular case where plaintiff's medical bills all but deleted the $10,000 primary coverage, Utica had to have been fully apprised that they had some liability to McDill as their insured.[5] In this case, had Utica tendered some reasonable amount of the general damages, they would not have been arbitrary and capricious and the penalty provision would not apply.
We recognize that La.R.S. 22:658 is penal in nature and is to be strictly construed. The stipulated sanctions should be imposed only in those instances in which the facts negate probable cause for non-payment. Crawford v. Al Smith Plumbing & Heating Services, Inc., 352 So.2d 669 (La.1977). However, we conclude that under the particular facts of this case, the statute would be rendered meaningless if McDill were not allowed to recover for penalties and attorney's fees for Utica's failure to tender a reasonable amount of his general damage award.[6] The facts simply refute any probable cause for non-payment.
Accordingly, our opinion is the trial court was not manifestly erroneous in concluding that Utica was arbitrary and capricious in its refusal to pay a reasonable amount over the $10,000 claim.

DECREE
Accordingly, the judgment of the Court of Appeal is reversed and the trial court's *1093 judgment awarding McDill penalties and attorney's fees is reinstated.
REVERSED AND TRIAL COURT'S JUDGMENT REINSTATED.
LEMMON, J., concurs and will assign reasons.
MARCUS, J., dissents and assigns reasons.
MARCUS, Justice (dissenting).
In establishing a "satisfactory proof of loss," an insured must establish the extent of his or her damages. La.R.S. 22:658 is penal in nature and should be strictly construed. The majority holds that upon a showing by the insured that the insurer will be liable for some general damages the "insurer must tender the reasonable amount which is due." No place in the statute is there a requirement of a tender by the insurer. The only question is whether the insurer was arbitrary or capricious in failing to make payment after the insured has established the extent of his or her damages in a satisfactory proof of loss. I do not consider that the insured made such a showing in this case. Accordingly, I respectfully dissent.
NOTES
[1] § 658. Payment of claims, policies other than life and health and accident; penalties.

All insurers issuing any type of contract other than those specified in R.S. 22:656 and 22:657 shall pay the amount of any claim due any insured including any employee under Chapter 10 of Title 23 of the Revised Statutes of 1950 within sixty days after receipt of satisfactory proofs of loss from the insured, employee or any party in interest. Failure to make such payment within sixty days after receipt of such proofs and demand therefor, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of 12% damages on the total amount of the loss, payable to the insured, or to any of said employees, together with all reasonable attorney's fees for the prosecution and collection of such loss, or in the event a partial payment or tender has been made, 12% of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney's fees for the prosecution and collection of such amount. Provided, that all losses on policies covering automobiles, trucks, motor propelled vehicles and other property against fire and theft, the amount of the penalty in each of the above cases shall be 25% and all reasonable attorney's fees. [emphasis added].
[2] On April 2, 1981, Stanley D. McDill executed an attorney-client contract agreeing to pay said attorneys 33 1/3% of any settlement obtained prior to instituting suit, 40% of any settlement verdict on recovery obtained after instituting suit, and 50% if appealed to a higher court.
[3] Utica did not receive notice of this claim until they were sued almost a year after the accident. Neither the medical records of Dr. Fraser or the medical records and bills of Dr. Kucharchuk were sent to defendant. No bill of any type from Dr. Lohmann concerning the operation was sent. The bills from Dr. Mass were of insufficient quality to allow one to calculate the total. Similarly, although a bill from Dr. Fraser was included, his name (on the bottom of the bill) was not reproduced on the photocopy sent to the insurer. Also, the work records were insufficient to establish the extent of that portion of the plaintiff's general damages.

The medical reports by the doctors who examined McDill immediately after the accident indicated that the plaintiff was complaining of pain in his neck and upper back. However, six weeks after the accident, the plaintiff was released by his doctor and returned to work. The medical reports indicated that the problem with his lower back did not manifest itself until eight months later. However, the plaintiff stated that his lower back problems began about a week after the accident. Three months after the surgery, the plaintiff began driving a truck again.
[4] Our independent research indicates that other general damage awards for disc injuries far exceeds $10,000.00.
[5] It is true that plaintiff was not content to take Utica's settlement offer which was below the full policy limits. Plaintiff was of the belief that his claim was worth more than defendant's offer. However, if the insurer conditions its offer to pay an undisputed amount on the insured's acceptance thereof in full settlement the offer is not viewed as an unconditional tender for purposes of La.R.S. 22:658.
[6] La.R.S. 22:658 was enacted in 1958, four years prior to the passage in 1962 of R.S. 22:1406(D), which provided for uninsured motorist coverage. When the legislature passed the provisions of R.S. 22:658 which state that the insurer must pay "the amount of any claim due" or have penalties and attorney's fees imposed, they did not contemplate the problem of calculating general damage awards that arise under uninsured motorist coverage. However, uninsured motorist coverage is a contract of insurance under the provisions of R.S. 22:658 and penalties must be imposed if the insurer fails to pay without probable cause. Hart v. Allstate Ins. Co., supra. If the insurer is not required to pay the portion of the claim which is unquestionably due within 60 days of the proof of that claim, R.S. 22:658 is rendered meaningless.