IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 8, 2009

Charles R. Fulbruge III
Clerk

No. 07-30963

XAVIER GRILLETTA, JR; RANDY LAUMAN

Plaintiffs-Appellees-Cross-Appellants

v.

LEXINGTON INSURANCE COMPANY

Defendant-Appellant-Cross-Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:06-cv-04333

Before KING, DeMOSS, and PRADO, Circuit Judges.

PER CURIAM:[*]

Hurricane Katrina wreaked havoc on the New Orleans area, destroying homes and businesses. One such casualty was a large vacation house located on the southeastern shore of Lake Pontchartrain. This appeal considers whether the insurer of the property must cover that damage.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs-Appellees-Cross-Appellants Xavier Grilletta ("Grilletta") and Randy Lauman ("Lauman") (collectively, the "Plaintiffs") owned a huge vacation home on the shores of Lake Pontchartrain. The house was approximately 6,000 square feet and included nine bedrooms, seven and a half bathrooms, three kitchens, two dens, a large main room measuring 25 by 60 feet, and an elevator. Water surrounded the house on three sides. The elevation of the lowest floor of the house was 16.22 feet NAVD,[1] with the lowest "horizontal member" at 15.21 feet NAVD. The property also included a large boathouse.

The Plaintiffs obtained homeowners' insurance from Defendant-Appellant-Cross-Appellee Lexington Insurance Company ("Lexington"). The insurance policy covers most damage—including damage from wind—but excludes coverage of "water damage," defined as damage caused by "flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind." In essence, therefore, if wind destroyed the house, then Lexington's insurance policy covers the damage; if water destroyed the house, then Lexington is not liable based on the water-damage exclusion. The policy limits are $400,000 on the dwelling, $40,000 on other structures, and $200,000 on contents in the house.

On August 29, 2005, Hurricane Katrina completely destroyed the house. Two days after the hurricane, the Plaintiffs reported the loss to Lexington. Lexington hired an outside adjuster, Wayne Wagner ("Wagner"), to work on the claim. Wagner met with the Plaintiffs at the property on September 27, 2005. After that meeting, Wagner requested additional information from the Plaintiffs, which they provided at another meeting on October 28, 2005. On November 10, 2005, Grilletta faxed a lost contents list to Wagner. On November 12, 2005,

---

[1] NAVD stands for North American Vertical Datum. In essence, "16.22 feet NAVD" means 16.22 feet above sea level.

Wagner submitted a final report to his superiors, who then forwarded the report to Lexington on November 13, 2005. Wagner concluded, "[t]he damage appears to be wind related" and "[t]he home was destroyed from wind and not flood." He recommended that Lexington pay the Plaintiffs $400,000 for the dwelling (the policy limit) and an additional $140,448 for the loss of contents, minus a deductible of $8,000, for a total payment of $532,448.

Lexington took no action until January 26, 2006, when it requested a damage causation analysis from Halliwell Engineering Associates, Inc. ("Halliwell Engineering"). The engineering firm retained meteorologist Andy Johnson ("Johnson") to examine the cause of the damage. Johnson determined that the maximum winds sustained at the property were between 95 and 100 miles per hour, with wind gusts possibly as high as 116 miles per hour. He concluded that this wind might have damaged the roof, doors, and windows, but was unlikely to have totally destroyed the property. He also found that the storm surge was between fifteen to sixteen feet, with waves superimposed on top. Johnson therefore concluded that a storm surge was the proximate cause of the destruction. His report stated, however, that wind damage to the roof might have occurred prior to any flood or storm surge. Halliwell Engineering submitted Johnson's report to Lexington on April 18, 2006.

Lexington told Wagner, the claims adjuster, to re-adjust the claim based on the Halliwell Engineering report, and specifically to assume that wind damaged the roof, which in turn could have led to interior damage. Wagner then submitted a report detailing the damage to the roof, siding, interior drywall ceilings and walls, insulation, flooring, cabinets, and contents. On June 5, 2006, Lexington paid the Plaintiffs $311,055.38, consisting of $191,674.58 for the house and $119,380.80 for contents.

On June 23, 2006, Grilletta wrote to Lexington to dispute its conclusion that the proximate cause of the destruction was anything other than wind,

question Lexington's failure to pay for the destruction of the boathouse, and state that he and Lauman reserved the right to submit a supplemental claim for lost contents. Lexington responded with a form denial letter. Thereafter, on August 15, 2006, the Plaintiffs brought suit.

In June 2007, the Plaintiffs included a supplemental claim for contents in a proposed trial exhibit. Lexington did not respond to this supplemental contents claim. The district court conducted a bench trial on August 23-24, 2007. At trial, the Plaintiffs sought payments for total destruction of the house, total destruction of the boathouse, supplemental contents coverage, and statutory penalties.

Regarding the destruction of the house, the Plaintiffs offered the testimony of engineer Leonard Quick ("Quick"). Quick stated that "[t]he property was destroyed by high wind forces, more probably than not, a tornado by way of the forensic physical evidence well in advance of the maximum height of flood water associated with a storm surge on the back end of the storm." Quick came to this conclusion by examining the forensic evidence at the property, albeit approximately fourteen months after the hurricane. Quick also stated that if there were not a tornado, then winds of 125-155 miles per hour destroyed the property. Regarding a storm surge, Quick stated that the house sustained a surge of only ten to twelve feet.

In response, Lexington submitted the testimony of two experts who provided a completely different analysis. Meteorologist Johnson stated that he examined the radar images of the area from the National Weather Service's Doppler radar in Slidell and could not find any evidence of a tornado. Lexington argued that Johnson's analysis of the radar images rules out the possibility of a tornado crossing the Plaintiffs' property. Johnson also used data from the National Climatic Data Center to conclude that the property sustained maximum winds of approximately 100 miles per hour, with gusts at 129 miles

per hour. Johnson testified that these winds were Category 2 winds on the Saffir-Simpson scale and could damage roofs, doors, or windows but could not cause major damage to the structure. Providing his theory of the cause of the destruction, Johnson stated that the height of the storm surge at the property—not counting the waves on top—was 15.3 feet, just touching the lowest horizontal members of the house. Engineer Todd Cormier ("Cormier") reviewed this meteorological data and described how, in his opinion, the force of the waves destroyed the house. He explained that a large storm surge exerted upward pressure and lifted the wood-frame house off of its foundation. He also noted that a storm surge destroyed a property known as "Old Glory" close to the Plaintiffs' property.

In sum, the Plaintiffs' expert, an engineer, asserted that either a tornado or high winds destroyed the house and that there was a small storm surge of ten to twelve feet. Lexington's experts, a meteorologist and an engineer, stated that there was no evidence of a tornado or winds strong enough to destroy the house and that a storm surge of at least fifteen feet caused the destruction.

The district court considered this evidence and issued written findings of fact and conclusions of law. The court noted that there was no dispute that the house was worth more than the $400,000 policy limit. It also stated that there was no dispute that the boathouse was worth more than the $40,000 policy limit for other structures, although Lexington did dispute this finding.

In its conclusions of law, the court recognized that an insurer has the burden of proving that a policy exclusion applies (once an insured suffers a loss), and it determined that Lexington had not met its burden here. Specifically, the court stated that "[a]t best, it is ambiguous as to what caused the destruction of the property." The court noted that Lexington and its experts conceded that wind could have caused some of the damage. Accordingly, the court held that the Plaintiffs were entitled to the full $400,000 payment for loss of the house.

The court also found that Lexington did not meet its burden of showing that water destroyed the boathouse and awarded the Plaintiffs the full $40,000 policy limit for this loss.

Regarding the Plaintiffs' claim for supplemental contents coverage, the district court ruled that because the Plaintiffs had not actually submitted a supplemental contents claim to Lexington itself, Lexington was not liable for any additional payments for contents coverage. The court then awarded the Plaintiffs statutory damages pursuant to Louisiana insurance law. Specifically, the court awarded 25% of the undisputed amount that Lexington eventually paid based on the satisfactory proof of loss, or 25% of $311,055.38 ($77,763.84). The court rejected the Plaintiffs' request for statutory penalties for the additional amount that the court had awarded. In sum, the court awarded the Plaintiffs $208,325.42 in additional payments for loss of the house, $40,000 for the loss of the boathouse, and statutory penalties in the amount of $77,763.84. Both parties appeal this ruling. Because the district court, which had diversity jurisdiction, issued a final judgment, we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II. DISCUSSION

### A. The House

#### 1. Standard of Review

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed de novo." Bd. of Trs. New Orleans Employers Int'l Longshoremen's Ass'n v. Gabriel, 529 F.3d 506, 509 (5th Cir. 2008) (quoting Water Craft Mgmt. LLC v. Mercury Marine, 457 F.3d 484, 488 (5th Cir. 2006)). Accordingly, we review the allocation of the burden of proof de novo and the decision on whether the party met that burden for clear error. See Guajardo v. Tex. Dep't of Criminal Justice, 363 F.3d 392, 395 (5th Cir. 2004) (per curiam).

6

2. Analysis

As the district court correctly explained, under Louisiana law, once an insured suffers a covered loss, the insurer has the burden of proving that a policy exclusion applies to avoid liability. See LA. REV. STAT. ANN. § 22:658.2(B) ("If damage to immovable property is covered, in whole or in part, under the terms of the policy of insurance, the burden is on the insurer to establish an exclusion under the terms of the policy."). The insurer must demonstrate that the policy exclusion applies by a preponderance of the evidence. See Ferguson v. State Farm Ins. Co., No. 06-3936, 2007 WL 1378507, at *1 (E.D. La. May 9, 2007) (citing Ferro v. Gebbia, 252 So. 2d 545, 547 (La. Ct. App. 1971)). As there is no dispute that the Plaintiffs suffered a covered loss, Lexington had the burden of proving by a preponderance of the evidence that the water-damage exclusion applied, i.e., that water destroyed the house.

When reviewing a district court's factual findings, this court may not second-guess the district court's resolution of conflicting testimony or its choice of which experts to believe. See Ayers v. United States, 750 F.2d 449, 455 (5th Cir. 1985) ("The resolution of conflicting testimony and the making of credibility choices are within the province of the court sitting without a jury, subject only to the clearly erroneous standard."). As we have previously stated, "[t]he credibility determination of witnesses, including experts, is peculiarly within the province of the district court. Consequently, we give deference to the findings and credibility choices trial courts make with respect to expert testimony." League of United Latin Am. Citizens No. 4552 v. Roscoe Indep. Sch. Dist., 123 F.3d 843, 846 (5th Cir. 1997) (internal quotation marks and citations omitted). Thus, we review the district court's finding that water did not destroy the house only for clear error.

The Louisiana Fourth Circuit Court of Appeal recently decided a very similar case, which guides our analysis. See Veade v. La. Citizens Prop. Corp.,

985 So. 2d 1275 (La. Ct. App. 2008). That case involved a house near the Grilletta-Lauman property that Hurricane Katrina also destroyed. Id. at 1277. At trial, the plaintiffs presented the testimony of the same engineer as in this case, Leonard Quick, who stated that high winds or a tornado, and not water, destroyed the property. Id. at 1279. The insurer presented the opinions of its own experts, who determined that water caused the destruction. Id. at 1279-80. The trial court weighed these competing views and concluded that the insurer had not met its burden of showing that the water damage exclusion applied. Id. at 1280. On appeal, the court noted that "Mr. Quick is an experienced forensic engineer who had conducted many Katrina related claim inspections." Id. The court ruled that the trial court had not committed "manifest error" in its findings, especially because there were "two opposing theories" as to the destruction of the property. Id.

Similarly, much of the bench trial in this case involved a battle of the experts. As discussed above, the Plaintiffs presented the testimony of Quick, the engineer, who stated that his review of the forensic physical evidence suggested that a tornado or high winds destroyed the house. Lexington responded with the testimony of two experts, who discounted the Plaintiffs' expert and concluded that the only plausible explanation was that water or flooding caused the destruction. On appeal, Lexington strenuously objects to the district court's finding that it did not meet its burden of showing that water caused the damage, arguing that "objective meteorological evidence" completely discounts the theory that a tornado or high winds destroyed the house. It notes that its meteorologist expert, Johnson, used objective data from the National Weather Service, the National Hurricane Center, the National Oceanic Atmospheric Administration, the National Climatic Data Center, and the United States Geological Survey. Lexington also points out that Quick did not offer any meteorological data and

instead relied on "unreliable" forensic evidence on the property, which he had examined roughly fourteen months after the hurricane.

However, Lexington's experts also conceded that a tornado or high winds could have damaged the house. Further, Lexington's engineer, Cormier, admitted that Halliwell Engineering originally concluded that a storm surge destroyed "Old Glory," the property nearby, but later removed that conclusion from future reports regarding that property. Thus, the evidence at trial was not as clear-cut as Lexington suggests.

Most tellingly, much like in Veade, our review of the record shows that there were "two permissible views of the evidence," meaning that "the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985). Although Lexington presented a persuasive argument that the meteorological data suggests that water was the proximate cause of the damage, the district court did not view that evidence as conclusive. Indeed, the main basis of this lawsuit is that it is unclear whether wind or water destroyed the house, and several experts offered differing views. Given that the trial consisted of a battle of qualified experts who all presented plausible theories, the district court was free to choose among these reasonable explanations in rendering its decision. Accordingly, by definition, the district court's resolution of this issue cannot be clearly erroneous, and we affirm the district court's finding.

B.    The Boathouse

    1.    <u>Standard of Review</u>

At the close of the Plaintiffs' case-in-chief, Lexington moved for judgment on partial findings under Federal Rule of Civil Procedure 52(c), arguing that the Plaintiffs failed to prove the value of the boathouse, which was an element of their claim. The district court denied the motion. In its final judgment, the court awarded $40,000 for coverage of the boathouse, the full policy limit for

"other structures." When considering a district court's ruling under Rule 52(c), this court reviews the district court's legal conclusions de novo and its factual findings for clear error. Bursztajn v. United States, 367 F.3d 485, 488-89 (5th Cir. 2004).

### 2. Analysis

At the trial, co-plaintiff Lauman described the boathouse as a twenty-three to twenty-four foot high structure that had sheet metal sides, a split-level pier, a covered deck, an open fishing area with four large fishing lights, running electricity and water, and a remote control electric launch for lifting, storing, and launching a twenty-seven foot boat. The district court, in denying Lexington's Rule 52(c) motion, stated that based on this description and an aerial photograph of the premises, it could conclude that the boathouse was worth well more than the $40,000 policy limit for "other structures."

Lexington challenges this finding on appeal, but it fails to demonstrate how the court clearly erred. For example, Lexington does not explain why the court went astray in relying on Lauman's detailed testimony about the boathouse. Although additional evidence might have been preferable to support its conclusion, it is well within the fact finder's discretion to consider this testimony, view an aerial photograph, and make an inference that the boathouse was, in the district court's words, a "pretty substantial structure" that would cost more than $40,000 to rebuild. Accordingly, we affirm the district court's finding on this issue.[2]

---

[2] Lexington also argues that the Plaintiffs failed to provide a satisfactory proof of loss for the boathouse. However, Lexington did not assert this argument as a basis for its Rule 52(c) motion, instead challenging only the evidence regarding the value of the boathouse, and the district court never made any findings regarding a satisfactory proof of loss for the boathouse. Accordingly, Lexington has waived this argument on appeal. See, e.g., Lemaire v. Louisiana, 480 F.3d 383, 387 (5th Cir. 2007) (stating that "arguments not raised before the district court are waived and cannot be raised for the first time on appeal").

C.    Supplemental Contents Coverage

    1.    Standard of Review

The district court found that the Plaintiffs did not provide Lexington with a satisfactory proof of loss for supplemental contents coverage, and, in a cross-appeal, the Plaintiffs challenge this conclusion.  This is a factual finding that we review for clear error.  See Gabriel, 529 F.3d at 509; Boudreaux v. State Farm Mut. Auto. Ins. Co., 896 So. 2d 230, 236 (La. Ct. App. 2005) (stating that "a trial court's determination that an insurer was not provided with a satisfactory proof of loss is a factual finding that may not be disturbed on appeal absent manifest error").

    2.    Analysis

On November 10, 2005, Grilletta faxed to Wagner a contents list for Wagner to use in his claim adjustment.  On June 5, 2006, Lexington paid the Plaintiffs $119,380.80 for loss of the contents of their house.  On June 23, 2006, Grilletta sent a letter to Lexington, which stated that the Plaintiffs were refining their contents list and were viewing the list as a "work in progress."  Lexington responded with what the Plaintiffs describe as a "form denial letter."  After the Plaintiffs initiated this suit, they presented Lexington with an additional claim for $79,745.00, along with a supplemental contents list, as part of a proposed trial exhibit.  The district court overruled Lexington's objection to the submission of the supplemental contents list.  However, the court ruled that because the Plaintiffs never officially submitted or proved the value of their supplemental contents claim, they were not entitled to additional payments.

The Plaintiffs argue that their trial exhibit satisfies the "flexible" requirement of providing a satisfactory proof of loss.  In support, they cite McDill v. Utica Mutual Insurance Co., 475 So. 2d 1085, 1089 (La. 1985), in which the Louisiana Supreme Court concluded that the insured had carried its burden of showing a satisfactory proof of loss to trigger penalties and attorneys' fees even

though the insurer first received notice of the claim when the insured filed the lawsuit. The Plaintiffs suggest that this means that, as a matter of law, they validly submitted a satisfactory proof of loss through the trial exhibit. See Sher v. Lafayette Ins. Co., 988 So. 2d 186, 198 (La. 2008) (stating that in McDill, the court "held that an insurer was liable for statutory penalties even though the insurer's first notice of the claim was the filing of suit almost a year after the accident occurred").

McDill is distinguishable, however, because in that case the insurer first learned of the entire claim when the insured filed the lawsuit, while here the Plaintiffs sought to supplement an already-existing claim through a trial exhibit. The district court ruled that the Plaintiffs had never submitted their supplemental contents claim to Lexington, and McDill does not change that finding. That is, the Plaintiffs read McDill too broadly in suggesting that a proposed trial exhibit will always give an insurer, as a matter of law, "sufficient information to act on the claim." Sevier, 497 So. 2d at 1384. Moreover, the Plaintiffs have not challenged the district court's implicit factual finding that the trial exhibit in this case did not satisfy the Plaintiffs' burden of submitting a satisfactory proof of loss. Accordingly, we affirm the district court's decision to deny additional payments for supplemental contents coverage.[3]

D.    Statutory Penalties

    1.    Standard of Review

Under Louisiana insurance law, an insurer is liable for statutory penalties for failing to pay a claim within thirty days if that failure was arbitrary and capricious. LA. REV. STAT. ANN. § 22:658(B)(1); Reed v. State Farm Mut. Auto. Ins. Co., 857 So. 2d 1012, 1019-20 (La. 2003). A determination of whether an insurer's failure to pay a claim was arbitrary and capricious is a finding of fact,

---

[3] We take no position on whether the Plaintiffs still could present a satisfactory proof of loss under the Lexington policy.

which this court reviews for clear error. See Hardy v. Hartford Ins. Co., 236 F.3d 287, 293 (5th Cir. 2001). We review the district court's legal conclusions regarding the statutory penalties de novo. See Gabriel, 529 F.3d at 509; Floors Unlimited v. Fieldcrest Cannon, 55 F.3d 181, 184 (5th Cir. 1995) (reviewing a district court's interpretation of state law de novo).

2.    Analysis

a.    Statutory Penalties on the Undisputed Portion of the Claim

LA. REV. STAT. ANN. § 22:658(B)(1) provides,

> Failure to make a written offer to settle any property damage claim
> . . . within thirty days after receipt of satisfactory proofs of loss of
> that claim . . . or failure to make such payment within thirty days
> after written agreement or settlement . . . when such failure is found
> to be arbitrary, capricious, or without probable cause, shall subject
> the insurer to a penalty [of 25%].[4]

To recover statutory penalties, the Plaintiffs must establish three elements: "(i) that the insurer received a satisfactory proof of loss, (ii) that the insurer failed to pay the claim within the applicable statutory period, and (iii) that the insurer's failure to pay was arbitrary and capricious." Boudreaux, 896 So. 2d at 233.

As discussed above, to show a "satisfactory proof of loss," the insurer must "receive[] sufficient information to act on the claim." Sevier, 497 So. 2d at 1384. The district court concluded that Lexington received a satisfactory proof of loss no later than November 13, 2005, when it received Wagner's report that wind caused the destruction of the house. Lexington then took no action on the claim until January 26, 2006, when it hired Halliwell Engineering to conduct a causation analysis. That is, Lexington failed to pay the claim within thirty days, as the statute requires. Further, the district court ruled that Lexington

---

[4] In 2006, the Louisiana Legislature amended this provision to increase the statutory penalties from 25% to 50%. See 2006 La. Acts 813. As that amendment is not retroactive, the parties agree that the 25% penalty applies to the facts of this case.

arbitrarily sat on the claim for over two months before deciding to hire Halliwell Engineering and that Lexington had no good-faith basis for delaying payment of the claim. Accordingly, the court awarded penalties on the amount that Lexington ultimately tendered on June 5, 2006.

Lexington takes issue with the court's finding that its delay was arbitrary and capricious. A failure to pay a claim is "arbitrary and capricious" if the insurer's refusal to pay is "vexatious." Reed, 857 So. 2d at 1021. The Louisiana Supreme Court defined "vexatious" in this context as "unjustified, without reasonable or probable cause or excuse." Id. The court concluded that this standard "describe[s] an insurer whose willful refusal of a claim is not based on a good-faith defense." Id. As the Louisiana Supreme Court recently stated, "there can be no good reason—or no probable cause—for withholding an undisputed amount." La. Bag Co. v. Audubon Indem. Co., No. 2008-C-0453, 2008 WL 5146674, at *8 (La. Dec. 2, 2008) (internal quotation marks omitted).

The district court rested its decision to award statutory penalties on the fact that Lexington did nothing on the Plaintiffs' claim after Wagner submitted his report, which concluded that wind caused the damage and recommended that Lexington pay the entire policy limit of $400,000 for the dwelling. After Lexington received Wagner's report on November 13, 2005, the Plaintiffs did not hear from Lexington, even though co-plaintiff Grilletta tried calling the insurer. Lexington had assigned the claim to file examiner Donald Fielder ("Fielder"), and although Grilletta could not reach Fielder, Grilletta managed to track down another file examiner, Phil Smith ("Smith"), to inquire about the status of the payment. On January 26, 2006, Smith requested an engineering report from Halliwell Engineering. Smith apparently had not reviewed Wagner's report and photographs, because in his email to Halliwell Engineering requesting the engineering report, he wrote, "[t]he adjuster's report does not include if a loss is a result of wind damage or flood." Additionally, neither Fielder nor Kristi

Fickeisen, Lexington's corporate representative who also was involved in handling the Plaintiffs' claim, had reviewed Wagner's report or photographs until just before the trial. Thus, it appears that Lexington began to act only after Grilletta contacted Smith, and at that point Smith decided to seek an engineering report instead of simply paying the claim. Moreover, there was never a dispute that wind caused at least some of the damage. Based on the two and a half month delay between when Lexington received Wagner's report and when it sought the engineering analysis, and given Lexington's failure to pay any undisputed amount within thirty days, the district court did not clearly err in concluding that Lexington's failure to pay the claim was arbitrary and capricious. See La. Bag Co., 2008 WL 5146674, at *8 ("Any insurer who fails to pay said undisputed amount has acted in a manner that is, by definition, arbitrary, capricious or without probable cause.") Accordingly, there was ample support for the district court's finding that there was "no good faith basis on which Lexington could have denied this claim," and we affirm the award of statutory penalties for the undisputed amount Lexington owed.[5]

> b. Statutory Penalties on the Entire Amount Due

The Plaintiffs also sought statutory penalties for the additional amount that the district court awarded in this case ($248,325.42), but the district court denied that request because it concluded that there was a reasonable dispute as to the nature of the total loss of the structure. The Plaintiffs assert on appeal that the district court erred as a matter of law.

As the Louisiana Fourth Circuit Court of Appeal explained,

---

[5] Lexington's argument that the delay was simply due to the large number of cases it had stemming from Hurricane Katrina is unavailing, as this does not explain why Smith sought an engineering analysis instead of consulting Wagner's report. It also does not explain why Lexington chose not to pay some amount to cover the damage from wind. This delay was the catalyst for the district court's decision to award statutory penalties, because Lexington did nothing with the claim even though the adjuster stated that wind destroyed the entire house.

> Case law reveals that where there is a reasonable disagreement between the insured and the insurer as to the amount of a loss, the insurer's refusal to pay is not arbitrary, capricious or without probable cause and failure to pay within the statutory delay does not subject the insurer to penalties. However, if part of a claim for property damage is not disputed, the failure of the insurer to pay the undisputed portion of the claim within the statutory delay will subject the insurer to penalties on the entire claim. Consequently, when such a dispute arises, to avoid the imposition of penalties the insurer must unconditionally tender to the insured the undisputed portion of the insured's claim.

Warner v. Liberty Mut. Fire Ins. Co., 543 So. 2d 511, 515 (La. Ct. App. 1989) (citations omitted) (emphasis added). In Shadow Lake Management Co. v. Landmark American Insurance Co., No. 06-4357 et al., 2007 WL 1959236, at *3 (E.D. La. July 2, 2007), the court reviewed the line of cases discussed in Warner and concluded, "if part of a claim for property damage is not disputed, the insurer's failure to unconditionally tender the undisputed portion of the claim to the insured within the statutory delay will subject the insurer to liability for the statutory penalties on the entire claim."

Lexington responds that the Plaintiffs' argument for a statutory penalty on the entire amount Lexington owed is based on outdated law. Prior to 1992, LA. REV. STAT. ANN. § 22:658 provided for a penalty on "the total amount of the loss." See 1990 La. Acts 262; 1989 La. Acts 638. In 1992, the legislature amended the statute to make the penalty a percentage of "the amount found to be due from the insurer to the insured." 1992 La. Acts 879. In 2003, the legislature amended the statute to increase the penalty from 10% to 25% of "the amount found to be due from the insurer to the insured." 2003 La. Acts 790. The 2003 version applies to the Plaintiffs' case. Lexington argues that the Louisiana courts have construed the "amount found to be due" under this statute to mean "that amount over which reasonable minds could not differ." Ibrahim

v. Hawkins, 845 So. 2d 471, 477 (La. Ct. App. 2003) (describing the "amount due" after an insured submits a satisfactory proof of loss).

However, the Louisiana courts have recently provided some guidance on this issue that undercuts Lexington's argument. In 2007, the Louisiana Fourth Circuit Court of Appeal cited Warner, a 1989 case, for the proposition that "if part of a claim for property damage is not disputed, the failure of the insurer to pay the undisputed portion of the claim within the statutory delay will subject the insurer to penalties on the entire claim." Sher v. Lafayette Ins. Co., 973 So. 2d 39, 60 (La. Ct. App. 2007) (citing Warner, 543 So. 2d at 515) (alteration omitted). The court then awarded a penalty of 25% of the total amount due, not just the undisputed portion. Id. at 65. On appeal, the Louisiana Supreme Court did not cite Warner or explicitly point out this rule, but it similarly awarded a 25% penalty on the entire amount due. Sher, 988 So. 2d at 208. In Louisiana Bag, the Louisiana Supreme Court noted that "an insurer need only fail to tender one undisputed portion of the claim to be subject to penalties on the difference between the amount paid or tendered and the amount found to be due." 2008 WL 5146674, at *13. Here, Lexington did not pay or tender anything to the Plaintiffs within the statutory deadline, so under this rule Lexington is liable for a statutory penalty pursuant to LA. REV. STAT. ANN. § 22:658 for the amount found to be due, i.e., the total amount of the Plaintiffs' loss. Thus, even though "R.S. 22:658 . . . [is] penal in nature and must be strictly construed," Sher, 988 So. 2d at 206 (quoting Reed, 857 So. 2d at 1020), the Louisiana Supreme Court has not interpreted the 1992 amendment to have changed the meaning of the law. Accordingly, we must reverse this portion of the district court's judgment and remand for the imposition of a 25% penalty on the entire amount due.

## III. CONCLUSION

Much of this case involves a review of the district court's factual findings, and there is no indication that the district court committed clear error. Accordingly, we AFFIRM the district court's decision regarding the house, the boathouse, and the supplemental contents coverage. The district court did err, however, when it failed to impose statutory penalties on the entire amount due. We therefore REVERSE that portion of the district court's opinion and REMAND for a recalculation of the statutory penalties.

AFFIRMED IN PART; REVERSED IN PART; REMANDED.