# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 11-262

**CARL R. GUIDRY, ET UX**

**VERSUS**

**STATE FARM FIRE AND CASUALTY COMPANY, ET AL.**

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-2005-5487
HONORABLE PATRICK LOUIS MICHOT, DISTRICT JUDGE

**********

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, and Phyllis M. Keaty, Judges.

**Amy, J., concurs in the result and assigns reasons.**

**Keaty, J., concurs in the result for the reasons assigned by Judge Amy.**

**AFFIRMED.**

**Kenny Layne Oliver**
**David Oliver Way**
**Oliver & Way, L.L.C.**
**P. O. Box 82447**
**Lafayette, LA 70598-2447**
**Telephone:  (337) 988-3500**
**COUNSEL FOR:**
    **Defendants/Appellees - Louisiana Farm Bureau Mutual Insurance**
    **Company and Evelyn B. Smith**

**Ian Alexander MacDonald**
**Jones Walker**
**P. O. Drawer 3408**
**Lafayette, LA 70502-3408**
**(337) 262-9000**
**COUNSEL FOR:**
    **Defendant/Appellant - Progressive Security Insurance Company**

**Michael Langdon Cave**
**Cave Law Firm, L.L.C.**
**3909 Plaza Tower Dr.**
**Baton Rouge, LA 70816**
**Telephone: (225) 292-3194**
**COUNSEL FOR:**
   **Plaintiffs/Appellants - Carl R. Guidry and Barbara Guidry**

**THIBODEAUX, Chief Judge.**

Carl Guidry was hit from behind in two vehicular rear-end collisions, two weeks apart. He sued the drivers and their insurers for each accident, and he sued his own insurance company for mishandling his underinsured driver claim. Mr. Guidry settled with and dismissed the defendants in the first accident and proceeded to trial against the defendants in the second accident, and against his own insurance company. Mr. Guidry appeals the jury's resulting general damages award of $10,000.00 as abusively low. Mr. Guidry's insurer also filed an appeal from the awards against it for arbitrary and capricious claims handling. We do not find an abuse of discretion and affirm the jury's awards in both instances.

I.

**ISSUES**

We must decide:

(1)    whether the jury's award of general damages for the second accident was abusively low; and

(2)    whether Mr. Guidry's own insurance company was arbitrary and capricious in its handling of Mr. Guidry's claims.

II.

**FACTS AND PROCEDURAL HISTORY**

On October 27, 2004, Carl Guidry and his granddaughter were rear-ended by Amber Guidry (Amber).[1] Mr. Guidry's truck was slightly knocked forward.

Two weeks later, on November 11, 2004, Mr. Guidry and his granddaughter were again rear-ended, this time by Evelyn B. Smith (Smith). Mr. Guidry had slowed for a vehicle turning in front of him. Ms. Smith testified that

---

[1]The plaintiffs are not related to Amber Guidry, the defendant driver in the first accident.

she did not see him in time, and afraid of flipping her SUV if she braked too hard, she hit him. Her SUV was towed, and Mr. Guidry sustained damage to his back bumper and tailgate, requiring repairs in the amount of $3,500.00. Mr. Guidry had neck and back pain after the first accident and neck, back, and shoulder pain after the second accident.

Carl Guidry and his wife, Barbara Guidry, along with the parents of their granddaughter, sued Amber and her insurer, State Farm Fire and Casualty Company, for the October accident; and, they sued Smith and her insurer, Louisiana Farm Bureau Mutual Insurance Company, for the November accident.

The plaintiffs subsequently amended their petition to add Mr. Guidry's uninsured/underinsured motorist (UM) carrier, Progressive Security Insurance Company, as a defendant.

Mr. Guidry and his wife settled with Amber and State Farm for the first accident and proceeded against Smith and Farm Bureau for the second accident. They proceeded against Progressive for both accidents. Following trial, the jury found that Mr. Guidry did not suffer damages in the October accident with Amber, who had settled for State Farm's policy limits of $10,000.00 and had been released. The jury found that Mr. Guidry did suffer damages in the November accident with Smith and awarded him medical damages of $19,859.40 and general damages of $10,000.00, to be paid by Smith's insurer, Farm Bureau. It also awarded Mr. Guidry's wife $2,500.00 for loss of consortium, to be paid by Farm Bureau.

The jury further found that Mr. Guidry's UM insurer, Progressive, had been arbitrary and capricious in handling Mr. Guidry's claims for general damages and medical expenses. The jury awarded Mr. Guidry $50,000.00 for the breach of

2

duty and $10,000.00 in attorney fees, with respect to the November accident.[2]  The trial judge awarded Mr. Guidry $100,000.00 in penalties against Progressive, pursuant to La.R.S. 22:1973.

Two appeals were filed in this matter:  (1) Mr. Guidry appeals his $10,000.00 general damage award against Smith and Farm Bureau as abusively low; and (2) Progressive appeals the $160,000.00 assessed against it for its breach of duty in handling the UM claims of Mr. Guidry.

For the following reasons, we affirm the general damage award against Smith and Farm Bureau, and we affirm the awards against Progressive for breach of duty, attorney fees, and penalties.

III.

**STANDARD OF REVIEW**

An appellate court may not set aside a trial court's findings of fact in absence of manifest error or unless it is clearly wrong.  *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993).  A reviewing court must keep in mind that if a trial court's findings are reasonable based upon the entire record, an appellate court may not reverse those findings, even if it is convinced that, had it been sitting as trier of fact, it would have weighed the evidence differently.  *Housley v. Cerise*, 579 So.2d 973 (La.1991).  The basis for this principle of review is grounded upon the better capacity of the trial court to evaluate live witnesses and upon the proper allocation of trial and appellate functions between the respective courts.  *Canter v. Koehring Co.*, 283 So.2d 716 (La.1973).

---

[2]Progressive states in its brief that, during trial, Mr. Guidry "dismissed" his UM claim for the second accident, pointing us to Mr. Guidry's attorney's question to Mr. Guidry on direct examination regarding a discussion of dropping the UM claim for the second accident.  This reference is ambiguous, as we find no such dismissal in the record, other than the dismissal of Barbara Guidry's loss of consortium claim against Progressive for the second accident.

IV.

## LAW AND DISCUSSION

### *Appeal of the Jury's General Damage Award*

Mr. Guidry contends that the jury's award of $10,000.00 for general damages was abusively low where the November accident caused a partial tear of the rotator cuff and AC joint impingement necessitating a Mumford Procedure, aggravated pre-existing cervical and lumbar problems, and was a substantial factor in causing an L4-5 disc herniation. Mr. Guidry further contends that: (1) medical causation established by Mr. Guidry's treating physician was uncontroverted; (2) the medical expense award included the treatment of the left shoulder injuries and aggravations to the cervical and low back areas; and, (3) there was no evidence of an intervening event.

Farm Bureau argues that the jury's modest award for pain and suffering was due to the jury's conclusion that Mr. Guidry sustained only minor aggravations of pre-existing conditions as a result of the November accident. It contends that the jury properly weighed the credibility of Mr. Guidry and his physicians regarding causation, given the incomplete history supplied by Mr. Guidry and his use of narcotic pain medication from multiple pharmacies and physicians for shoulder and back injuries since 1989.

Mr. Guidry was a chronic pain patient who had been disabled since 1989, when he fell on an offshore rig. He underwent surgery to his left shoulder. Subsequently, Dr. Louis Blanda, an orthopedic surgeon with the Lafayette Bone & Joint Clinic, performed a surgical fusion at L5-S1 that had to be re-grafted the following year. The fusion appeared solid in some images and appeared failed in others. Mr. Guidry continued to have back pain and was on pain management with various pain management physicians from that time forward.

4

Mr. Guidry was rear-ended in 1997 in an automobile accident. Dr. Blanda treated him conservatively for a small disc herniation at C5-6; this included physical therapy, pain medication, and various injection therapies.

In 2002, pursuant to a CT of the lumbar spine, Dr. Doreen Abadco found a bulging disc at L4-5 and treated Mr. Guidry with nerve blocks.

Following the October 2004 accident, Mr. Guidry went to the emergency room at Southwest Medical Center with complaints of neck and back pain. His x-ray showed degenerative disc disease at L5-S1 and at C5-6 with a straightening of the lordotic curve of the cervical spine involving neck spasm. The Southwest emergency room physician diagnosed him with cervical and lumbar strain, gave him pain medication, and told him to see an orthopedist if his problems persisted.

Following the second accident in November, 2004, Mr. Guidry went to the emergency room at Our Lady of Lourdes Hospital with neck and back pain. He was examined, x-rayed, and told to see his primary doctor in a week. His x-rays again showed degenerative disc disease at the prior fusion site, L5-S1, and at C5-6.

For the subject accidents, Dr. Blanda first saw Mr. Guidry on December 16, 2004, after a rescheduled appointment earlier in December. Mr. Guidry complained of injury and pain in his neck, his left shoulder, and his lower back. Dr. Blanda noted that Mr. Guidry had neck and back pain with numbness in his legs after the first accident, and had shoulder pain and an increase in the neck and back pain with continuing numbness in the legs after the second accident. Objectively, Dr. Blanda found spasm in Mr. Guidry's neck and low back muscles. Mr. Guidry had weakness upon lifting his left shoulder, called abduction; a feeling of crepitus or a grinding, roughened sensation in his shoulder joint; and, diffuse numbness and loss of grip strength in his left hand.

Dr. Blanda ordered an MRI of Mr. Guidry's neck and left shoulder and a CT scan of the lumbar spine. The CT scan showed arthritic changes at the prior fusion site, L5-S1, with a central broad-based disc herniation and spinal stenosis at L4-5, the level above the prior fusion. The MRI of the cervical spine indicated a small central focal subligamentous herniation of the disc at C6-7. The MRI of the left shoulder showed arthritic spurs at the AC joint and was suspicious for a partial tear of the rotator cuff.

In January of 2005, Dr. Blanda recommended surgical decompression and instrumentation at L4-5 and rotator cuff repair for the shoulder. He required a deposit of $27,721.46 for his estimated surgical services, but never received insurance authorization for the surgeries.

Dr. Blanda next saw Mr. Guidry in May of 2005. He still had neck, low back, and left shoulder pain, but reported that the back was somewhat improved. He asked about a referral since his pain management physician was moving his practice to Baton Rouge. Dr. Blanda was still waiting for authorization for the recommended surgeries.

Dr. Blanda saw Mr. Guidry in November of 2005. His left shoulder was still painful and weak, and he wanted the procedure done. With ongoing pain management, his neck and back symptoms had stabilized to a tolerable level. Dr. Blanda wanted an updated MRI before determining what type of surgery should be done. Mr. Guidry continued to treat with pain management specialists but did not see Dr. Blanda again until September of 2008.

In October of 2008, Dr. Blanda reviewed new MRI's of the low back and the left shoulder, as well as an x-ray of the shoulder. The x-ray showed arthritis of the AC joint and the ball and socket part of the shoulder. It also showed calcitic tendonitis, or calcification of the rotator cuff, which, as Dr. Blanda explained, is the body's way of trying to heal the tear. The calcium deposits can

also produce pain. The MRI of the shoulder now showed the calcifications instead of a tear and more arthritis and impingement on the rotator cuff. Instead of a rotator cuff repair, Dr. Blanda now recommended a Mumford Procedure, which is the removal of the tip of the clavical, or collarbone, to relieve the pain in the AC joint as well as the pressure in the impingement. The Mumford Procedure was performed on December 22, 2008, and was successful in relieving Mr. Guidry's shoulder pain. It was paid for my Medicare/Medicaid.

Dr. Blanda testified that disc herniations were caused by lifting, bending, twisting, and any sudden flexion or extension. He indicated that a fairly common cause of sudden flexion or extension is being hit from behind in a low-impact, rear-end vehicular accident; the cause does not have to be a bone-breaking blow or blunt trauma type of accident. Dr. Blanda indicated that most people injure the rotator cuff by falling or bracing themselves to prevent a fall which is the same mechanism as holding on to a steering wheel and being rear-ended.

Dr. Blanda stated that Mr. Guidry's pre-existing low back problems had limited him to light or sedentary activity, and the new problems increased the pain and his whole body physical impairment by ten to fifteen percent due to the new back injury. Dr. Blanda assessed the aggravation of the pre-existing neck injury at ten percent and the shoulder injury at around twenty percent as it involves the physical functioning of the arm as well.

Dr. Blanda stated that, while it was difficult to sort out which accident caused which injury, he thought that the October accident started the process with the L4-5 disc herniation, aggravating low back problems and causing numbness in the legs; it also initiated the neck problems, aggravating an asymptomatic condition in the neck. Dr. Blanda opined that the November accident further aggravated the back and neck problems and caused the need for a new surgery of the left shoulder.

7

Dr. Blanda was aware that Mr. Guidry had used various pain management physicians over the years and that he had been discharged once before the subject accidents and once after the subject accidents for simultaneously using the services of two pain management physicians. He testified, however, that he had treated Mr. Guidry orthopedically for twenty-one years and did not consider him to be a liar and had never had that issue with him. Dr. Blanda explained that pain management therapists try to do what is necessary to make a patient comfortable for a better quality of life. He made a distinction between addiction and a dependence on pain medication needed for quality of life issues.

The only other physician to testify was Dr. Michael Duval, an orthopedic surgeon in Lafayette who examined Mr. Guidry's left shoulder on behalf of Farm Bureau on December 2, 2008, over four years after the accidents, but before the Mumford Procedure performed by Dr. Blanda. Dr. Duval testified that he specialized in shoulders and did not examine Mr. Guidry's neck or back. He described the 2004 accidents as low impact events which would not cause a rotator cuff tear. He did not find symptoms of a rotator cuff tear in 2008.

Dr. Duval opined that Mr. Guidry had osteoarthritis of the ball and socket joint (back of shoulder) and arthritis of the AC joint (front of shoulder; end of collar bone) and said that his Hawkins test, which is an elbow to nose test, was positive for AC joint pain. He stated that numbness in the hands is a symptom of a herniated cervical disc but not of a rotator cuff injury or a shoulder impingement, as shoulder pain does not refer past the elbow. Dr. Duval said that he would not expect to see an aggravation of arthritis from a low impact rear-end accident.

Dr. Duval admitted that he did not know the speed of the vehicles in either accident and that he had spent only ten to fifteen minutes with Mr. Guidry. Dr. Duval also stated that, when he evaluated Mr. Guidry, he was examining him for an opinion on a rotator cuff repair, which is not the surgery that was later

8

performed. Dr. Duval stated that Dr. Blanda subsequently performed a Mumford procedure, which addressed the AC joint arthritis, and he admitted that he did not know the outcome of that surgery. He opined that a trauma can aggravate, but did not cause, Mr. Guidry's shoulder problems. Dr. Duval testified, however, that bracing oneself with an arm, as if bracing for a fall, can cause an aggravation to a pre-existing arthritic condition. He admitted that he had examined Mr. Guidry over four years after the subject accidents and that the treating physician does have a better perspective on a patient's good days and bad days because of having treated the patient over time.

"As a general rule, the treating physician's testimony should be given more weight than that of a doctor who examines a claimant for diagnostic purposes only." *Knox v. Calcasieu Parish Police Jury*, 04-1497, p. 8 (La.App. 3 Cir. 4/27/05), 900 So.2d 1128, 1134 (quoting *Clark v. State Farm Ins. Co.*, 520 So.2d 860, 864 (La.App. 3 Cir. 1987)).

There is no doubt that Mr. Guidry, with his history of prior injuries, surgeries, and conditions, was an eggshell plaintiff. In fact, he had been disabled for fifteen years when these accidents occurred in 2004, and he had been in pain management for a long time. However,

> [t]he defendant's liability for damages is not mitigated by the fact that the plaintiff's pre-existing physical infirmity was responsible in part for the consequences of the plaintiff's injury by the defendant. It is clear that a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct.

*Bienemann v. State Farm Mut. Auto. Ins. Co.*, 08-1045, p. 4 (La.App. 3 Cir. 2/4/09), 3 So.3d 621, 623 (quoting *Lasha v. Olin Corp.*, 625 So.2d 1002, 1005 (La.1993)).

Here, Mr. Guidry settled with the driver from the October accident, Amber Guidry, and with her insurer, State Farm, prior to trial. The jury made no

award for that accident, stating on the verdict form that there were no injuries. This is contrary to Dr. Blanda's impression, but Mr. Guidry did not appeal that portion of the verdict. Mr. Guidry's appeal addresses the second rear-end collision by Smith in November, which is insured by Farm Bureau.

On the day of the second accident, November 11, 2004, but prior to the accident at 3:45 p.m., Mr. Guidry went to his pain management physician, Dr. Paul Hubbell, with complaints of low back pain. He reported that Mr. Guidry was medically stable, was tolerating his medications well, was able to do his housework and tend to minor activities, and that Mr. Guidry reported "an improved quality of life." Mrs. Guidry testified that after the accident, Mr. Guidry could not sleep, wash his own hair, or reach items overhead. The jury found that Mr. Guidry was injured in the second accident and awarded him $10,000.00 in pain and suffering, and $19,859.40 for past medical expenses, to be paid by Smith's insurer, Farm Bureau.

Mr. Guidry appeals only the $10,000.00 general damage award as abusively low. His counsel cites various cases and suggests that the jury should have awarded damages for pain and suffering between $50,000.00 and $150,000.00. However, the cited cases do not involve a plaintiff who was already disabled with as extensive pre-existing injuries as those of Mr. Guidry. In general, an appellate court reviews an award of damages for an abuse of discretion and may only raise or lower the award to the nearest reasonable amount. *Coco v. Winston Indus., Inc.*, 341 So.2d 332 (La.1976). While we find that the jury's award of $10,000.00 for general damages in Mr. Guidry's case was low, we cannot say that it was abusively low for the aggravation injuries that the jury assessed to Farm Bureau for the second accident.

### Progressive's Appeal

Progressive was Mr. Guidry's UM carrier at the time of both accidents. It paid no amounts for Mr. Guidry's medical care resulting from either accident. The jury found that Progressive had breached its duty in handling the claims of Mr. Guidry with respect to the November accident and awarded him $50,000.00 in general and special damages, plus $10,000.00 in attorney fees. The trial judge awarded Mr. Guidry $100,000.00 in penalties, citing La.R.S. 22:1973.[3]

Progressive contends that it was not arbitrary and capricious in handling Mr. Guidry's claims and that the jury and trial judge erred in awarding him any sums because: there was no evidence that Mr. Guidry communicated an intent to claim medical payments; there was a good faith dispute regarding whether Mr. Guidry sustained any injuries in either accident; and, the jury's award was well within Farm Bureau's policy limits. We disagree. After a thorough review of the record and applicable law, we find that there was a reasonable factual basis in the record for the jury's awards, and the statutes support the award by the trial judge.

---

[3]Louisiana Revised Statutes 22:1973 provides in pertinent part:

> A. An insurer . . . owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
>
> B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A:
>
> . . . .
> (5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.
>
> . . . .
>
> C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater.

Mr. Guidry had three vehicles insured through Progressive and paid over $1,200.00 in annual premiums. His coverage on the 1997 Ford truck that he was driving when rear-ended in October and November of 2004 was not in dispute. His medical pay coverage under the policy was $5,000.00 per accident. The UM portion of his policy provided him $25,000.00 in coverage for each accident. Hence, Mr. Guidry's own policy provided a total $60,000.00 of coverage for both accidents.

The testimony of Progressive's representative, Vickie Hale-Benson, established that Progressive had received notice of Mr. Guidry's 2004 accidents and began investigating the coverage by September of 2006, within the period required to file a UM claim. Ms. Hale-Benson testified that she had spoken to Mr. Guidry's attorney on several occasions about resolving the claims but she considered those settlement discussions, not written demands for specific amounts.

In general, if the insured has shown that he was not at fault, that the other driver was uninsured or underinsured, and that he was in fact damaged, the insurer cannot avoid liability when the insured is unable to prove the exact extent of his general damages; rather, the insurer must tender the reasonable amount due as a sign of its good faith and its willingness to comply with the duties imposed upon it under the insurance policy. *McDill v. Utica Mut. Ins. C*., 475 So.2d 1085 (La.1985). "This amount would be unconditionally tendered to the plaintiff not in settlement of the case, but to show their good faith in the matter and to comply with the duties imposed upon them under their contract of insurance with the insured. The amount that is due would be a figure over which reasonable minds could not differ." *Id*. at 1091-92. An insurer must take substantive and affirmative steps to accumulate the facts necessary to evaluate a claim; merely opening a file is not sufficient. *McClendon v. Economy Fire & Cas. Ins. Co.*, 98-1537 (La.App. 3 Cir. 4/7/99), 732 So.2d 727.

Here, Progressive opened its file in September of 2006 but did not depose Mr. Guidry's treating physician and orthopedist, Dr. Blanda, until June 13, 2008, almost two years later.

Progressive knew in September of 2006 that Mr. Guidry's policy covered both accidents; that Dr. Blanda had previously recommended surgery; and that State Farm had paid its policy limits of $10,000.00 for the first accident.

Progressive noted in July of 2007 that it needed to sort out causation between the two accidents, but it would be another year before they deposed Dr. Blanda. It still had not obtained Farm Bureau's policy or determined how much coverage Smith had for the second accident. Its notes indicate that it was waiting for Farm Bureau to put up money for the second accident, but Progressive did not obtain Farm Bureau's coverage amount for the second accident until July of 2008.

Nor did Progressive tender any of the medical pay coverage of $5,000.00 per accident that Mr. Guidry had paid a premium for in his policy, separate from the UM coverage of $25,000.00 per accident. Progressive also knew that Mr. Guidry's granddaughter had been injured when her knee hit the dashboard in the second accident, and that she had resolved her claims and would not be seeking UM coverage from Progressive.

When Dr. Blanda was finally deposed on June 13, 2008, he indicated that he wanted updated MRI's before recommending surgery again. However, he opined that the first accident started the new spinal problems and that the second accident aggravated those and caused the shoulder to become symptomatic. Progressive did not schedule a second opinion medical examination (IME) of Mr. Guidry to refute any of Dr. Blanda's assessments. Dr. Blanda's records showed that Mr. Guidry, who had been in pain management since 1989, said he could not live with the pain that he was experiencing in January of 2005, after the 2004

13

accidents. Yet, Progressive noted in its records that there was no change in Mr. Guidry's pre and post-MVA complaints.

Progressive had known at least since March of 2008 that Mr. Guidry had been disabled in the old work accident and did not have money for the L4-5 and left shoulder surgery that Dr. Blanda had recommended in January of 2005. It knew that he had property damage of $3,000.00 to his truck (Mr. Guidry testified that his truck repairs were $3,500.00), and noted that there were at least aggravation injuries from the accidents. But Progressive did not offer a tender or file a subrogation suit to recover its tender, even after it had evidence of causation.

In July of 2008, Progressive's notes indicate that it evaluated its worst case exposure at $34,000.00; it calculated $2,500.00 per month for general damages, times twelve months, based upon Mr. Guidry's visits with Dr. Blanda only, plus $4,000.00 in medical expenses with Dr. Blanda. Progressive received, for the first time, verbal confirmation that Smith's policy with Farm Bureau was for $300,000.00. It noted that Farm Bureau was going to try the case, even though at this point there was still nothing to refute Dr. Blanda's testimony finding causation in both accidents.

In August of 2008, Mr. Guidry made a total demand of $50,000.00 for both accidents, inclusive of the medical pay amounts. He informed Progressive that he was returning to Dr. Blanda for new MRI's. Progressive made no good faith tender of any amount. In September of 2008, Mr. Guidry amended his suit against Progressive to add a claim for arbitrary and capricious claims handling. In October, Dr. Blanda obtained new MRI's showing that the rotator cuff tear had calcified; he then recommended a Mumford Procedure, instead of a rotator cuff repair.

In early December of 2008, over four years after the accidents, Farm Bureau, not Progressive, deposed Dr. Duval regarding the second opinion

examination of Mr. Guidry's shoulder that he had performed for Farm Bureau. Dr. Duval did not agree that there had been a rotator cuff tear or relate the shoulder injury to either accident; he did not assess the back and neck injuries at all.

In mid-December of 2008, Dr. Blanda performed the Mumford Procedure as explained above. It was paid for by Medicare/Medicaid.

In May of 2009, Mr. Guidry's counsel informed Progressive that Mr. Guidry had undergone the shoulder procedure and again asked for $50,000.00 to resolve all claims. Progressive knew that Mr. Guidry was not at fault for either accident and that both Amber and Smith were at fault for rear-ending Mr. Guidry in the respective accidents. Progressive did not tender any amount.

In July of 2009, Progressive filed a motion for summary judgment seeking relief on the issue of arbitrary and capricious claims handling, stating that Dr. Blanda was not recommending surgery. Dr. Blanda's deposition, used in support, was over a year old. In fact, Dr. Blanda had performed the shoulder procedure six months earlier, in December of 2008, and Progressive had known about the surgery at least by April of 2009. In opposing Progressive's motion for summary judgment, Mr. Guidry's attorney attached medical summaries showing over $16,642.61 in medical bills alone. Progressive's July 2009 motion for summary judgment was denied. Still, it tendered no good faith amount for any of Mr. Guidry's medical care, not even one of the $5,000.00 medical pay amounts.

In January of 2010, Mr. Guidry's counsel asked for $35,000.00 to settle his claims. At the time of trial in June of 2010, no tender had been made, and Mr. Guidry had received nothing for the second accident or the related medical expenses, surgery, and general damages.

Progressive had never scheduled depositions with, or called, any of Mr. Guidry's pain management physicians, but it knew of Dr. Hubbell's report of November 11, 2004, stating that Mr. Guidry was medically stable before the

November accident later that same day. Progressive had medical authorizations from Mr. Guidry for all of his medical records, which reflected that he was in unrelievable pain in January of 2005, and that he continued to have unrelieved shoulder pain until the surgery in December of 2008. Progressive's notes indicate that it knew that Mr. Guidry was disabled and could not afford surgery. It had evidence of aggravation injuries and causation but made no good faith effort to investigate or assist its insured with his medicals. It did not even tender the $5,000.00 medical pay coverage after the Mumford Procedure.

The jury ultimately found that Mr. Guidry suffered injuries and awarded him damages that finally paid for the Mumford Procedure that relieved his shoulder pain over four years after the accident. Based upon all of the foregoing, we conclude that the jury was not unreasonable in finding that Progressive breached its duty to Mr. Guidry by failing to pay the amount of any claim within sixty days and by failing in its duty to timely investigate the accidents.

Progressive argues that Mr. Guidry did not prove that he suffered actual general or special damages by Progressive's failure to tender policy amounts and cites *Sultana Corp. v. Jewelers Mutual Insurance Co.*, 01-2059 (La.App. 1 Cir. 12/31/02), 837 So.2d 134. That case, however, was reversed. Proving actual damages is not a prerequisite to an assessment of penalties under La.R.S. 22:1973, formerly R.S. 22:1220. In reversing the first circuit and in deciding a split among the circuit courts regarding proof of damages, the Louisiana Supreme Court in *Sultana Corp. v. Jewelers Mutual Insurance Co.*, 03-360 (La. 12/03/03), 860 So.2d 1112, articulated as follows:

> As to the other circuit courts of appeal who have addressed the question of whether proof of actual damages is a prerequisite to the award of penalties, *Midland Risk Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 93-1611 (La.App. 3 Cir. 9/21/94), 643 So.2d 242, best

illustrates the countervailing position that a showing of damages is not required. The Third Circuit stated:

> Section 1220(A) legislatively imposes a duty of good faith and fair dealing on insurers. Section 1220(B) enumerates certain acts, which if knowingly committed or performed by an insurer, constitute a breach of its duty of good faith and fair dealing.
>
> Penalties are imposed to discourage certain types of conduct by an insurer. The language in Section 1220(C) does not expressly require that a claimant suffer damages before recovering penalties. Moreover, if this requirement was so, the statute's purpose more often would be thwarted. Claimants may decide not to file claims against insurers if the disputed amount or the damages are not substantial. As an end result, the misconduct which the legislature obviously intended to curb or deter would thrive. Thus, we find if an insurer commits any one of the acts enumerated in Section 1220(B), penalties may be imposed without a showing of damages.

*Midland*, 643 So.2d at 244.

*Sultana*, 860 So.2d at 1118. The *Sultana* court then stated:

> [W]e find the Third, Fourth, and Fifth Circuits' holdings with regard to the interpretation and application of LA.REV.STAT. ANN. § 22:1220(C) correct and more reconcilable with the Legislature's enactment of this statute. Such an understanding squares well with the principle that an insurer's duty of fair dealing emanates from the contractual and fiduciary relationship between the insured and insurer.
>
> . . . Requiring the insured or claimant to prove general or special damages as a prerequisite to the award of penalties as advocated in the First Circuit, even though the insured or claimant has not so claimed, interjects a requirement not provided in the statute.

*Sultana*, 860 So.2d at 1118-19 (citations omitted).

In *Hudson v. AIG Nat. Ins. Co.*, 10-63 (La.App. 3 Cir. 6/2/10), 40

So.3d 484, AIG, the UM carrier, made a tender of $11,744.00, which was

17

essentially too little and too late and was rejected as arbitrary and capricious. Pursuant to La.R.S. 22:1973(B)(5), the trial court awarded $25,000.00 in damages, and pursuant to La.R.S. 22:1973(C), it awarded double that amount, or $50,000.00, in penalties. We affirmed, citing *Sultana*.

More recently, in *Wegener v. Lafayette Insurance Co.*, 10-810 (La. 3/15/11), 60 So.3d 1220, a Katrina wind-and-flood-damage case, the Louisiana Supreme Court reiterated its finding under *Sultana*, and again quoted with approval the reasoning and language set forth by this court in *Midland*, that penalties may be imposed under La.R.S. 22:1220(C) (now 22:1973(C)) without a showing of damages. In *Wegener*, the jury interrogatories were found to have misled the jury to the extent that it was prevented from dispensing justice on the issue of mental anguish damages and penalties under La.R.S. 22:1220, and the case was remanded for a new trial.

Specifically, in *Wegener,* Interrogatory 9 asked whether the plaintiffs suffered mental anguish damages due to one insurer's conduct. If the jury answered "YES," it was instructed to proceed to Interrogatory 10, relative to the amount of mental anguish damages, and then to Interrogatory 11, relative to penalties. However, if the answer was "NO" as to mental anguish damages under Interrogatory 9, the jury was instructed to skip Interrogatories 10 and 11. Consequently, the jury, which did not award mental anguish damages under Interrogatory 9, skipped Interrogatories 10 and 11. The *Wegener* court stated that, "because penalties are permissive pursuant to La.R.S. 22:1220 [22:1973] even if no damages have been awarded as a result of the breach, the structure of the Jury Interrogatories in this case resulted in legal error."

Accordingly, based upon the foregoing, Mr. Guidry does not have to prove actual damages resulting from the breach, and we cannot say that the jury abused its discretion in awarding $50,000.00 to Mr. Guidry for Progressive's

18

breach of its insurer's duty to timely investigate the claims of its insured causing Mr. Guidry to wait four years for a surgery that ultimately relieved his shoulder injuries. Likewise, the trial court did not abuse its discretion in awarding double that amount under La.R.S. 22:1973(C) for penalties due to Progressive's arbitrary and capricious conduct.

Progressive also argues that, pursuant to *Sher v. Lafayette Insurance Co.*, 07-2441 (La. 4/08/08), 988 So.2d 186, nonpecuniary damages are *only* available if the insurer *intended* to aggrieve the feelings of the insured. Progressive not only misstates *Sher*, but it attempts to strip that court's holding completely bare of its contextual foundation. *Sher* involved Katrina-based property loss and breach of a commercial insurance contract which covered only economic loss. The plaintiff unsuccessfully sought mental anguish damages under La.Civ.Code art. 1998. That article provides that nonpecuniary losses "*may* be recovered," not "*may only* be recovered," when the contract is intended to gratify a nonpecuniary interest, such as creative work, and the obligor knew or should have known that its failure to perform would cause that kind of loss. *See* La.Civ.Code art. 1998 (emphasis added). It addresses conventional obligations and contracts and does not provide the *only* circumstances in which nonpecuniary damages can be awarded. Under La.R.S. 22:1973, an insurer is liable for *any* damages, *general or special*, sustained as a result of the breach. La.R.S. 22:1973(A) and (C).

Following its reasoning in *Manuel v. Louisiana Sheriff's Risk Management*, 95-406 (La. 11/27/95), 664 So.2d 81, and the Federal Fifth Circuit's reasoning in *Dickerson v. Lexington Ins. Co.*, 556 F.3d 290 (5th Cir. 2009), the Louisiana Supreme Court in *Wegener*, 60 So.3d 1220, explained that the good faith duties of an insurer under La.R.S. 22:1220 (now R.S. 22:1973) are separate and distinct from its duties under the insurance contract. The *Wegener* court specifically held that Article 1998 has no applicability in a claim for mental

19

anguish damages under La.R.S. 22:1220 (22:1973), which permits "'any general or special damages' with no limitation or additional requirement other than the breach of duty by the insurer." *Wegener*, 60 So.3d at 1230. Hence, the court in *Wegener* found that the trial court's inclusion of a jury instruction requiring proof of intent was legal error.

Progressive argues that the jury's award of $10,000.00 for attorney fees was unsupported where there was no evidence in the record that Mr. Guidry incurred attorney fees or the value of those fees. This argument has no merit. The record contains twelve volumes of documents and is replete with evidence of Mr. Guidry's attorney's representation for six years. The fees awarded are certainly reasonable and appropriate under Rule 1.5 of the Rules of Professional Conduct, where the factors to be considered include time, labor, experience, skill, results obtained, and whether there is a contingency payment method.

## V.

## CONCLUSION

Based upon the foregoing, the Judgment of the trial court is affirmed in all respects. Costs of these appeals are assessed to the plaintiff and to Progressive, respectively.

**AFFIRMED.**

20

NUMBER 11-262

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

CARL R. GUIDRY, ET UX

VERSUS

STATE FARM FIRE AND CASUALTY COMPANY, ET AL.

AMY, J., concurring in the result.

Like the majority, I find that an affirmation is required in this case. However, in my view, the damages and penalties awarded pursuant to La.R.S. 22:1973 must be affirmed under the wording of the statute alone. I do not find that this is a case controlled by *Sultana Corp. v. Jewelers Mut. Ins. Co.*, 03-0360 (La. 12/3/03), 860 So.2d 1112.

Louisiana Revised Statutes 22:1973 distinctly provides for damages sustained due to a breach of the duty of good faith and fair dealing, under Paragraph A, and for penalties due to that breach, under Paragraph C.

In my view, the record supports the jury's $50,000 award for damages due to the breach of duties owed under La.R.S. 22:1973(A). As cited by the majority, Mr. Guidry sustained medical expenses and experienced pain, suffering, and frustration associated with the multi-year delay in treatment. Thus, the plaintiff presented proof of these damages and the award of damages in the amount of $50,000 is supported.

As for the penalty provision, La.R.S. 22:1973(C) separately provides for penalties not to exceed "two times the damages sustained" *or* "five thousand dollars, whichever is greater." In this case, and as stated above, the record supports the view that Mr. Guidry sustained $50,000 of general and special damages under Paragraph (A). Thus, the $100,000 penalty awarded in this case is

permissible under the La.R.S. 22:1973(C) as it is "two times the damages sustained[.]" I do not find that this type of award could be supported absent proof of actual damages insofar as the damages are necessary for the calculation. On this point, I depart from the majority's reference to *Sultana*, 860 So.2d 1112.

The facts of *Sultana*, 860 So.2d at 1118, are at odds with the present matter insofar as the plaintiff in the supreme court case was "entitled to seek general or special damages from its insurer[,]" but it "chose not to seek such damages[.]" Although the plaintiff in *Sultana* did not seek or prove actual damages, the supreme court found that a penalty was still available under La.R.S. 22:1974(C). In my view, such an award would be under the alternative, $5,000 award under Paragraph (C) as the calculation necessary for the arguably greater award would be impossible without proof of the amount of damages sustained. In reaching its conclusion, the supreme court in *Sultana* favorably cited this court's opinion in *Midland Risk Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 93-1611 (La.App. 3 Cir. 9/21/94), 643 So.2d 242, a case in which only the $5,000 penalty was at issue.

In this case, since the plaintiffs proved and were awarded general and special damages, I believe that the $100,000 penalty is permissible insofar as it is "two times the damages sustained." The majority's reference to proof of actual damages being unnecessary is irrelevant under these facts since the record contains proof of damages. Thus, I would affirm the damages and penalties in light of the evidence in the record and under the terms of La.R.S. 22:1973(A) and (C).

For these reasons, I concur in the result.

2